NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ARMCO DRAINAGE & METAL PROD-
UCTS, Inc., Fabricating Division,
Respondent.

No. 12110.

United States Court of Appeals,
Sixth Circuit.

Feb. 18, 1955.

Fannie M. Boyls, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers and Nancy M. Sherman, Washington, D. C., on the brief), for petitioner.

Malcolm F. Halliday, Cincinnati, Ohio (George R. Cassidy, Charles A. Atwood [of Frost & Jacobs], Cincinnati, Ohio, on the brief), for respondent.

Before ALLEN, McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed a petition for enforcement of its order requiring respondent to cease and desist from unfair labor practices in violation of Title 29 U.S.C.A. § 158(a) (1), (2), and (5), in interfering with and coercing its employees in the exercise of their rights of self-organization, and in refusing to bargain collectively with the representative of such employees, and further requiring respondent to post the appropriate and customary notices directed by the Board.

The controversy, as well as the inception of union organization among respondent's employees, began in 1951 when, under the law then prevailing, respondent was unable to increase wages without approval from the Wage Stabilization Board because of the fact that its plant had not been in operation on January 15, 1950, the so-called "base date" on which the Wage Stabilization Board's self-executing regulations were based. In order to increase wages, respondent, therefore, pursuant to the regulations, filed with that Board on September 4, 1951, a petition seeking permission to grant, effective as of that date, a ten-cent hourly increase to all of its employees, and an additional five-cent hourly increase to approximately one-sixth of its employees who were believed to be receiving a lower wage rate than other employees performing substantially the same work; and the petition set forth that the employees had no recognized or certified bargaining agent and that no representation petition was then pending. Proceedings dragged on, and although more than three months elapsed after respondent had petitioned for increased wages for its hourly manual workers, nothing was done. The workers, therefore, not receiving the wages to which they were entitled and which the respondent company wished to pay them, apparently became restive, and in December, 1951, one of the employees requested the UAW-CIO, hereinafter called the union, to organize the plant and assist the employees. After five months had passed with no sign of life on the part of the Wage Stabilization Board with respect to respondent's petition to increase the wages of its employees, the union, as of January 29, 1952, had obtained designation cards signed by 93 of the 144 employees of respondent company, forming a unit appropriate for collective bargaining purposes. By letter of that date, the union informed respondent of its majority status and requested respondent to meet and negotiate with it as the collective bargaining agent of respondent's employees. The letter asked for an immediate reply, and when, by February 5, no reply had been received, the union filed a representation petition with the National Labor Relations Board.

On March 18, 1952, pursuant to a stipulation between the union and respondent, a consent election was held, with the result that 75 votes were cast against the union, 63 for the union, and one vote was challenged. Thereafter, on objections filed by the union to the election, the Regional Director filed his report on such objections and recommended that a hearing be held thereon at the same time as a hearing on a complaint, filed as a result of charges by the union that respondent had been guilty of unfair labor practices, subsequent to the union's notification to it that a majority of the employees had designated it as their collective bargaining agent, and prior to the date of the election. The Board found that the election was not an expression of the employees' free choice and did not represent their uncoerced wishes as to collective bargaining representation, and that re-

**576**

spondent had been guilty of the unfair labor practices heretofore mentioned.

■ It is submitted by respondent that genuine doubt, or doubt in good faith, on the part of an employer that a union represents the majority of the employees justifies refusal of bargaining with such a union until its majority representation is demonstrated, and that the Board has followed such a principle in the past. That principle, however, is irrelevant in this case as there is no evidence of any such doubt on the part of respondent. On January 29, 1952, the union informed respondent that a majority of its employees had designated it as their bargaining agent and that the union desired the respondent to recognize it and negotiate with it; the union stated that if respondent failed to comply with its request for recognition for bargaining, it would regard such conduct as a violation of the Act; and it requested an immediate reply to the bargaining request. Respondent never acknowledged the letter or any of the requests of the union. After waiting one week, the union filed a representation petition with the Board. At no time did respondent ask to see any proof that the union was designated as bargaining agent by a majority of the employees; nor was there any evidence that as of January 29, 1952, respondent disbelieved that the union had been designated by the majority of the employees. The most that respondent has to say in defense or explanation of its failure to answer the union's request for recognition and to enter into collective bargaining, as set forth in the union's letter of January 29, is that the union's letter came as a complete surprise to respondent; that it was written by the International Representative of the union who was a stranger to respondent; that great secrecy surrounded the union's organizational campaign; that the union cards were signed, for the most part, between January 14 and January 19, 1952, a considerable time before the union announced its majority status; that the card signers testified, without exception, that they signed secretively and without respondent's knowledge; and that the union did not come out into the open until its letter of January 29.

None of these considerations justifies a refusal to reply to the union's notification of its bargaining status or a refusal to recognize it, bargain with it, or, at least, to inquire as to the proof of its designation as bargaining agent for the majority of the employees. Before the representation election was agreed to be held, a new general manager had been appointed, on February 22, and in reply to a letter from the union dated March 11, again demanding recognition as the employees' bargaining agent and stating that 115 employees had signed cards designating it as their representative, the general manager stated that respondent would wait until the employees had the chance of voting for their bargaining agent in a secret election. At the time he wrote the letter, the general manager had learned, during the course of a friendly, somewhat confidential personal conversation with one of the employees he had known for some years, that the employee in question was the treasurer for the union, and had collected and had on hand at that time money representing the aggregate dues for 115 of respondent's employees. On the hearing, in answer to a question as to whether there was any doubt in his mind at the time he wrote the letter that the union represented a majority of respondent's employees, the general manager replied: "In the absence of any evidence, the doubt was not in my mind, it wasn't a matter of doubt." Respondent contends that it was incumbent upon the union to demonstrate to respondent that it was the choice of the majority of the employees, as bargaining agent.

■ The Board found that on January 29, 1952, 93 out of 144 employees had designated the union as their bargaining agent in a unit appropriate for collective bargaining; and this finding is sustained by substantial evidence on the record as a whole. The filing of the representation petition did not excuse the

respondent from complying with the union's request after February 5. National Labor Relations Board v. Inter-City Advertising Co., 4 Cir., 190 F.2d 420, 421; National Labor Relations Board v. Model Mill Co., Inc., 6 Cir., 210 F.2d 829. The evidence likewise sustained the Board's finding that respondent was guilty of a violation of the Act in refusing to bargain with the union as the representative of respondent's employees. National Labor Relations Board v. Model Mill Co., Inc., supra; National Labor Relations Board v. Drummond, 6 Cir., 210 F.2d 828; Joy Silk Mills v. National Labor Relations Board, 87 U.S.App.D.C. 360, 185 F.2d 732. Counsel for respondent ably and persuasively discuss other cases from federal courts seemingly *contra* to the adjudications above referred to, but we are agreed in following the conclusions heretofore set forth. It may also be said that even though an employer be in doubt as to a union's authority, such doubt does not excuse it where it is plain that its position was not based upon any doubt but upon its unwillingness to treat with the representative of its employees. National Labor Relations Board v. Dahlstrom Metallic Door Co., 2 Cir., 112 F.2d 756. As hereafter appears, it is plain that in this case, respondent's failure to treat with the union was not because of its doubts of the union's authority to represent the employees, but because of its unwillingness and opposition to the union in question. When the refusal of an employer to bargain is due to a desire to gain time and to take action to dissipate the union's majority, the refusal is no longer justifiable and constitutes a violation of the duty to bargain, and it is clear that such was the reason for respondent's refusal to bargain with the union in this case.

■ The Board found that respondent, instead of acknowledging the letter of the union advising that it had been designated bargaining agent for the majority of the employees, immediately declared its opposition to the union to its employees, and embarked upon a course of conduct which revealed that it was really concerned with undermining the union's strength and breaking down its claimed majority, and the evidence sustains this finding. An order which would fail to guarantee to the union restoration of the status which it would have enjoyed, except for an employer's conduct in wrongfully refusing to bargain, would allow such party to profit by its own wrong. Accordingly, the petition for an order requiring the employer to bargain, upon request, with the union which represented a majority prior to the commencement of the unfair labor practice that tended to destroy the union's majority, will be granted.

We come, then, to the other alleged unfair labor practices committed by respondent. One of the circumstances concerning which respondent and petitioner devote a large part of their briefs is concerned with a letter sent out by respondent and contended by petitioner to be a false statement of the facts, and unwarranted and prejudicial to the union, and, on the other hand, claimed by respondent to be entirely justified by the facts. It appears that on February 29, 1952, the new general manager wrote every employee, setting forth the amount of back pay to which each would be entitled according to the petition previously filed by respondent with the Wage Stabilization Board. The general manager stated therein that he had already told many of the employees that the Board election would hold up action on the petition; that only a few days before, he had received word that approval had been granted by the Wage Stabilization Board to increase wages in six jobs "which had been out of line by five cents an hour;" and that he had asked respondent's lawyers whether respondent could legally pay this increase. He continued:

"So you will understand this situation and have all the facts, I am attaching a copy of our attorney's letter as well as the letter from the Wage Stabilization Board.

"I hope you will read both of them carefully. If you do, you will see

that we are not permitted to make this payment because of the CIO election. If a new bargaining agent is voted in by the election, any wage increase finally agreed upon in a new contract could only start then and not September 7, 1951.

"This worries me a lot because you have been told differently by outside sources who do not understand our situation. You have all been so friendly and helpful to me that I do not want to see you lose your back pay because of bad advice."

In the copy of the letter from respondent's legal counsel which the general manager enclosed in his letter to the employees, counsel advised respondent that because of the pending election, the company should not make payment of any wage increases theretofore requested, and, furthermore, if the CIO should win the election, there would be limits on retroactive pay set by the Wage Stabilization Board which would be applicable to any bargaining that might follow; that the increase could be retroactive to either the beginning of negotiations or the date on which the union was certified, but no earlier; and that this situation required counsel to advise repondent to withhold any wage increases at that time.[1]

■ There appears to be no question that the advice of counsel was given in good faith. In fact, his good faith is virtually conceded by petitioner, and, in our opinion, rightly so; and the letter

---

[1] Counsel's letter to the company, dated February 29, 1952, is as follows:

"Gentlemen:

"In reply to your letter of February 28, 1952, we must advise that you cannot at this time make payment of any wage increases as requested by the Company in September 1951 of the Wage Stabilization Board.

"On February 28, 1952, the Company received from the Wage Stabilization Board a letter in which approval is given for 5c adjustments in hourly rates of a limited number of job classifications. However, this approval was conditioned as follows:

"' * * * this approval has no force and effect in the event the facts are not as represented in your application.'

"When the Company filed its application for wage increases in September 1951, the Company reported to the Wage Stabilization Board that there was no claim for representation pending before the National Labor Relations Board and there was no election pending as the result of any action of the National Labor Relations Board.

"On February 5, 1952, the UAW-CIO filed a petition with the National Labor Relations Board claiming to represent your employees. By such filing, the CIO union changed the facts so that the statement which the Company gave to the Wage Stabilization Board, namely, that no representation petition is pending, is no longer true.

"The CIO union in pursuing its case before the National Labor Relations Board had an election set for March 18. As a result, Resolution 42 of the Wage Stabilization Board must be considered. This reads:

"'On any application for an adjustment in wages, salaries or other compensation in which the National Labor Relations Board or similar state agency has ordered or scheduled a representation election, the WSB will defer action while such election is pending.'

"Because of the action taken by the CIO in filing its petition with the National Labor Relations Board and in having an election set, the facts upon which approval was given in the Company's application have been changed and therefore the statement in the letter of the Wage Stabilization Board 'that the approval has no force and effect in the event the facts are not as represented in (the) application' would be controlling.

"Therefore, as attorneys for the Company, we must advise that because of the pending CIO election, the Company should not make payment of any wage increases as heretofore requested by the Company.

"Furthermore, should the CIO win the election, the following limits on retroactive pay set by the Wage Stabilization Board would be applicable with reference to any bargaining which might follow:

"'Where a first contract is being negotiated, the increase can be retroactive to either (1) the beginning of negotiations or (2) the date the union was certified, but no earlier' (W. S. B. Interpretation Bulletin on Regulation No. 6).

"This last situation also requires us to advise you to withhold any wage increases at this time."

from the general manager to the employees could not be said to misinterpret the legal advice which respondent had received. Was, then, the general manager's assertion that the employees would lose their back pay if the union won—based on the letter of respondent's legal counsel—a "calculated scheme to induce employees to vote against the Union by holding out to them the immediate loss of economic benefits if they did not do so," as found by the Board? This is a difficult question, although, of course, we assume, as we are required to, that the facts are for the Board, and that its findings are conclusive if sustained by substantial evidence on the record as a whole. A careful examination of the evidence does not show support, however, for the contention of petitioner that the general manager's own testimony "shows that he himself believed at all times that if the UAW won the election the employees could receive back pay retroactive to September 4, 1951, if the UAW consented thereto." No one knew what the Wage Stabilization Board would decide. It was frequently difficult to secure its assent to an increase of wages; and often its decisions applicable to industry in general doubtless must have seemed to result in hardship in individual cases. It is true that prior to receiving the legal advice from the respondent's counsel, the general manager asserted to one of the employees that the company would regard the question of a retroactive wage increase as a bargaining issue if the union won, but that respondent would put pressure on the Wage Stabilization Board to have such back pay approved and paid immediately, if the union did not win; and he further stated his personal view to be that it was a question for bargaining, but that he did not assume to give that view as a legal opinion. But the general manager's later reliance upon the advice of respondent's legal counsel certainly would not indicate a belief on his part that the employees would receive back pay retroactive to September 4, 1951, if the union consented thereto. For counsel's advice was directly contrary to such a conclusion.

In this regard, another matter is argued strenuously by both sides. It appears that in the battle of campaign pamphlets prior to the election, the union accused respondent of attempting to use the matter of the increase in wages for the purpose of bribing the employees to vote against the union and urged the company to pay the increase. On March 6, 1952, the union, having already discussed the matter generally with the Wage Stabilization Board at Washington, D. C., received a letter from the executive director of that agency stating that its policy did not "prevent the putting into effect of an increase approved by the Board even though a union election is scheduled subsequent to the date of approval." On March 11, 1952, the union forwarded a copy of this letter, together with a letter of its own, to respondent, in which it charged respondent with misrepresenting the facts and misleading the employees by its letter of February 29, and demanded that respondent mail a letter of retraction to each employee, and also make payment of the authorized retroactive pay. On March 13, 1952, respondent replied to the union's letter and charged the union with misrepresentation to the Wage Stabilization Board, and also declared that the letter from the executive director was not in response to a request for a ruling in its particular case.

The union's letter to the Wage Stabilization Board did not, as respondent pointed out, request advice as to what would be the effect of the approval by the Board of a wage increase where an election date had been established *before* such approval of the increase, as was the case in the present controversy. On the other hand, it requested information as to the effect of such an approval where the election date had been established after the approval had been granted; and the letter to the union from the executive director of the Board related only to a case where an election date was scheduled after the approval of the increase had been granted. If an election is agreed upon before approval of a wage increase, and such wage increase is ac-

tually paid before the election, it ordinarily results in disadvantage to a union seeking election as a bargaining agent, and, by the same token, in advantage to an employer who opposes such union.

■ The Trial Examiner found—and his finding was adopted by the Board—that counsel for respondent was clearly in error in his letter of advice "expressing an opinion that WSB regulations would preclude, in the event of union certification, further processing—even with the cooperation of the Union—of the Company's previously filed petition for retroactive wage adjustments, and foreclose as a matter of law retroactivity back of the certification date." There is nothing before us from which it can be ascertained that counsel was in error in his opinion. In the report of the Trial Examiner, adopted by the Board, the regulations in question are referred to and quoted, but like many such regulations, they are complicated and obscure and, in themselves, do not disclose that counsel was mistaken in his opinion; the official interpretation of the regulation referred to in counsel's letter to respondent, in fact, supports the statements in respondent's letter to its employees; and respondent's counsel, in their brief and argument here, strenuously urge that the legal opinion in question was correct and accurately stated the policy of the Wage Stabilization Board. We do not know whether the legal opinion was right or wrong; and there is nothing in the record, regulations, or law cited to us from which the question can be resolved. In such an obscure situation, all that can be said, on this aspect of the case, is that there is no evidence to sustain findings of unfair labor practices based on the counsel's legal opinion which was submitted by respondent to its employees, or based on its letter accompanying such opinion.

■ The Board found that threats had been made, just before the election, by a supervisory employee, that respondent would sooner or later find out which employees were signing affidavits with respect to claimed unfair labor practices

on the part of respondent and would automatically fire any employees who furnished such statements in support of the alleged unfair labor charges. These threats were alleged to have been made at the time when the International officer was contemplating filing charges of unfair labor practices against respondent. A fair reading of the record discloses that this isolated so-called threat, if made at all, was made, just before the election, as an angry retort to what the supervisory employee must have considered a taunt in the course of an argument in which an employee told the supervisor that "if we didn't win this election there would be charges filed before the ballot is counted." No charges of unfair labor practices had at that time been made, and the supervisory employee, hearing of the challenge for the first time, obviously could not have spoken with the company's authority in the matter; and the employee must have known this. Such an isolated instance is magnified, when looked at alone. The incident can only be reasonably considered as an instance of hotheadedness in a dispute between two individuals.

■ It appears that much of the activity of the respondent in the election campaign was directed to telling employees how much better a certain independent union would be than the union here in question and that such conduct resulted in a number of employees withdrawing from the original union, during the campaign, in order to join the independent union; and it is contended that the action of respondent thereby resulted in disadvantage to the union by contributing to its loss of the election. In this regard, it also appears that, in answer to a question from an employee as to how long employees would have to wait for another election and another opportunity to choose a bargaining representative in the event the union lost the election, the general manager replied that they would have to wait a year. This was true. However, the general manager added that if the independent union could demonstrate that it had a majority, it

could be recognized without an election and without the employees' being required to wait a year. This was also true; but having failed to recognize the original union in the case, as we have held that it should, respondent was already guilty of the unfair labor practice of refusal to bargain. There is, however, no evidence to show that then, or at any time since, the employees desired to have the independent union represent them, or that it ever demonstrated or claimed that it represented a majority of the employees; and there is no evidence to show that the respondent has ever recognized the independent union as the bargaining agent of the employees, or that the independent union had sought such recognition. Consequently, that portion of the order that directs respondent to refrain from recognizing the independent union is not justified and such portion of the order, as well as the notice directed to be posted which is based thereon, will have to be stricken.

There is no evidence to support the finding that respondent was responsible for any pressure or coercion exerted upon the employees in their selection of a bargaining agent by third parties. If such third parties were guilty of trying to coerce the employees, there is no proof that respondent was guilty of assisting in any such coercion. Petitioner's most serious claim in this regard is that one of these third parties had implied that the company would close and leave the town if the union won the election. The general manager of respondent, however, prior to this alleged statement, had clearly stated to the employees, in answer to a question on this very point, and, apparently, to clear up unfounded rumors, that the company would not close its plant if the union won. An implication in the statement of the third party, contrary to the management's stand on this point, certainly could not be said to have influenced the employees who were carrying on a constant discussion with the officers and supervisors. The fact that meetings were held between such third parties and respondent is not evidence nor does it give rise to reasonable inferences that respondent was assisting in attempts to coerce or influence its employees. Respondent had the right to express its opinions on the controversy and to cooperate with third parties who had been responsible for bringing the company to the town, in advancing arguments against the union, as long as no intimidation or coercion was indulged in, or benefits promised or threats made, express or implied.

We next consider whether there were offers of benefits and threats of reprisals made to employees by respondent with the object of defeating the union in the representation election. Immediately after receiving the union's letter stating that it represented the majority of the employees, the general manager then in charge, Mr. Senter, told the shop committee, which was at that time in existence as the representative of respondent's employees, that if the union became the bargaining representative, respondent's plant would in all probability be locked up, and moved out of the town; that the petition to increase wages would "go out"; that the employees would lose their back pay; and that there would be no more overtime pay. The members of the shop committee, which was considered a conduit for information from management to the employees, afterward repeated what the general manager had told them to a meeting of respondent's employees. The evidence also disclosed that when two out of three members of the shop committee, who had joined the union, posted their resignations from the shop committee on the bulletin board on the ground that they were no longer really representing the employees, the general manager called them into his office, told them that they had acted in an underhanded manner, and that he thought he knew what side they were on. He later told another employee that the union was going to cause the men in the shop to lose more than $100 each— obviously a reference to a retroactive allowance of increase in pay for which

the respondent had petitioned the Wage Stabilization Board.

■ Because of our conclusions with respect to the above mentioned letter of respondent's legal counsel and the letter of respondent to its employees, we are of the view that no unfair labor practices resulted from respondent's statement that if the union came in, the employees would lose their back pay. For the "back pay" in question meant the increase for which respondent had filed the petition; and what was meant by everyone in references to back pay was the increase in wages which it was hoped would be allowed by the Wage Stabilization Board, to take effect retroactively. The foregoing statement, together with the statement that the petition would be shelved if the union won, did not constitute unfair labor practices in the light of counsel's letter and a fair reading of the official interpretation of the regulations of the Wage Stabilization Board, as quoted therein. For Senter's statement that the petition for increase of wages would have to be shelved, if the union won, is reasonably to be interpreted to the effect that the Wage Stabilization Board would not act upon the petition during a labor dispute, and that if the union won, it would have to draw up a new petition in accordance with the regulations of that Board.

■ As to Senter's interrogation of employee Gill, Foreman Johnson's questioning of employees Hensley, Johnson, Sollars, and Stauffer, and Foreman Jardine's like questioning of employees Fryant and Rhonemus, the Trial Examiner, in his report, stated that except for Senter's questioning of Gill, he did not regard the interrogations as too consequential and gave them little weight in his appraisal of the more basic issues in the case, but that "under well established Board precedents they are found to constitute illegal interferences with employee rights." We find nothing, however, in the interrogations that justifies the conclusion that they had the purpose or effect of intimidating or coercing the employees or interfering with their rights of free organization. They consisted of no promises of benefits or threats of reprisal. The statements made were merely arguments and understood to be such by the employees. Respondent opposed the union most strenuously in its arguments; but the statements made did not consist of threats of what the company would do if the union were selected by the employees but what, in its opinion, the union would do, and what the results might be, in the light of the experience with the union in question, on the part of respondent and its employees at another plant. Throughout the examination of the entire record, we have been assiduous to discover promises, threats, intimidation, or coercion; and these, we have not found. Instead, there was a continuous argument, day after day, back and forth, between the employees and the general manager, and between the foremen and the employees covering every phase which has been presented to us. Bulletins and pamphlets issued by both sides argued and answered all the propositions that have been argued in this case. During the course of the hearing, the Trial Examiner remarked that one witness had stated that, as they approached the election, the employees spent 75% of their time talking and 25% of their time working. An employee, who was on the stand as a witness for the Board at the time the Trial Examiner made the statement, replied: "I don't think there was that much work done." In no labor case that has come before us does there seem to have been as much unrestrained talk on the part of everyone, as well as absence of any fear of the consequences of expressing their opinion, on the part of the employees. In the light of this complete freedom of discussion and indulgence in argument for and against the union on the part of all of the employees as well as the supervisors and officials—to the abandonment of most of the work of the company— it is impossible to conclude that Senter's statement a month and a half before the election that he did not want the plant used as an election hall contributed to the defeat of the union. The plant seems

to have been used by everyone—employees, supervisors, and officials alike—as an election hall; and it is a most notable fact that in spite of all of this discussion and argument, no employee ever felt he was being discriminated against or that he would suffer any disadvantage or discrimination because of his views as to the union or his expression or argument as to those views; and no one ever did.

It is to be remembered, in considering whether Senter's statements constituted threats that influenced the employees in their rights of free organization, that they were made shortly after he was notified, to his surprise and disbelief, of the union's majority, and that several weeks before the election, a new general manager was appointed in his place; that the new manager, in contradiction to Senter's statement that the company would probably close if the union came in, stated to the employees that, on the contrary, the company would not close if the union came in. As to the statement alleged to have been made by Senter to employee Berry that there would be no more overtime if the union won the election, Berry, on cross-examination, testified that there was no indication from the company that overtime would not be continued; and this statement was never repeated by Senter, nor ever voiced by the new general manager who replaced him, during practically all of the period in which the employees were engaged in the union controversy.

Many of the conversations about the union and the independent union were started by the union employees themselves, and many of the questions with regard to various phases of the entire controversy were first asked of officials and supervisors by those employees.

The Trial Examiner, in the light of the foregoing facts, felt called upon, in his able and comprehensive report to the Board, to declare that respondent was not "absolved from liability, because the record shows that many plant employees, including some of those questioned, openly professed their union sympathy without apparent fear of such disclosure." This was based on the ground that any questioning of employees on union matters is inherently coercive since it implies a threat of possible future employer reprisals, and, therefore, limits employees in their right of self-organization.

 An employer's interrogation of employees must be judged in the light of the totality of the conduct of the employer. The coercive effect of the language used should be determined by the entire factual context in which it is spoken. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348. Considering the record as a whole, we are of the opinion that the evidence does not sustain findings that respondent, in its statements to its employees, coerced, restrained, or interfered with them in their right of self-organization, or that, in its relations with its employees, it was guilty of an expression of any views containing a threat of reprisal or promise of benefit.

During the several weeks before the election, the employees argued with and directly contradicted not only the supervisory employees but the officials of the company, without any fear of discrimination or disfavor; and both sides maintained their views as to the merits or demerits of the union with the same freedom and to the same extent as they have in the arguments of counsel in the case before us. If there were any evidence that the statements made by respondent's officials or supervisory employees expressly or implicitly coerced, intimidated, interfered with, threatened, or promised benefits to the employees, we would be bound to hold that such statements constituted unfair labor practices; but there is no evidence to support such conclusions.

 As to respondent's contention that under the most recent decision of the Board[2] holding that a labor organ-

**2.** Aiello Dairy Farms, 3-CA-637.

ization that has lost an election cannot establish its representative status by proceedings based upon unfair labor practices of which it had knowledge prior to the election, it is the rule that a change in the policy of the Board does not require its application to the disposition of cases theretofore decided by it and cannot be availed of by a respondent against whom an order has been entered prior to the adoption of such policy. National Labor Relations Board v. Red Rock Co., 5 Cir., 187 F.2d 76, 78. See also Brooks v. National Labor Relations Board, 348 U.S. 96, 104, note 16, 75 S.Ct. 176.

In accordance with the foregoing, an order will be entered enforcing paragraphs 1(a) and 2(a) of the Board's order which require respondent to cease and desist from refusing to bargain collectively, and directing it, upon request, to bargain with the union; paragraph 2(b) providing for the posting of copies of notice will be enforced subject, however, to the limitation that such notice will be confined in scope to the aforementioned paragraphs 1(a) and 2(a); paragraph 2(c) providing for notification to the Regional Director will also be enforced; and the petition for enforcement as to the other provisions of the order is denied.