NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WHEELING PIPE LINE, Inc.,
Respondent.

No. 15369.

United States Court of Appeals
Eighth Circuit.

Jan. 24, 1956.

Arnold Ordman, Atty., N. L. R. B., Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Kalvin Kahn, Atty., N. L. R. B., Washington, D. C., were with him on the brief), for petitioner.

Lawrence B. Burrow, Jr., Little Rock, Ark. (J. A. O'Connor, Jr., El Dorado,

Ark., Lawrence B. Burrow, Sr., and Moore, Burrow, Chowning & Mitchell, Little Rock, Ark., were with him on the brief), for respondent.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

The decision of the National Labor Relations Board and its Order of January 20, 1955, against the respondent, Wheeling Pipe Line, Inc., here involved, are reported at 111 N.L.R.B. No. 43. This petition for enforcement of the Order of the Board presents the question whether, on the record as a whole, there is substantial evidence to support it.

The Company has its principal terminal at El Dorado, Arkansas, and transports petroleum and related products in five adjoining states, employing at the relevant time eighty-one drivers constituting a unit appropriate for bargaining. No question as to the jurisdiction is involved. The events that are relevant arose out of an organizational campaign among respondent's drivers and a demand for recognition of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local No. 568, A.F.L., which a majority of 48 out of the 81 drivers chose to represent them. The Company refused the demand for recognition of the Union and a strike in protest of the refusal ensued.

■ The Board found that in the course of the campaign the respondent threatened and interrogated its employees with respect to their union membership and activities, and solicited individual strikers by promise of benefit to return to work, thereby violating Section 8(a) (1) of the Act, 29 U.S.C.A. § 158(a) (1). The Board found further that respondent's refusal to bargain with the Union constituted a violation of Section 8(a) (5) and (1) of the Act and the Board also found that respondent violated Section 8(a) (3) and (1) of the Act by discriminatorily discharging employee Arthur Cross because of his union activities and by paying returning strikers a lesser Christmas bonus than they would have received had they not participated in the strike. The Order, for which enforcement is prayed here, was based upon the findings. If they are supported by substantial evidence, the order should be enforced.

The examiner who saw and heard the witnesses reported his findings in detail in his Intermediate Report in which he undertook to set out and assess all the evidentiary facts relied on by respondent as well as those opposed.

The Board considered the report with the exceptions and briefs of the respondent and the entire record and adopted all of the examiner's findings, conclusions and recommendations that are here relevant. That action of the Board was unanimous except that one member dissented from the majority finding that respondent violated Section 8(a) (3) and (1) of the Act by paying returning strikers the lesser Christmas bonus.

None of respondent's points against enforcement of the Order is directed against the Board's findings to the effect that certain of the Company's supervisory employees discouraged union organization by threatening and interrogating employees in respect to their union membership and by solicitation of strikers. The contentions for respondent here are: (1) that there was no substantial evidence to support the finding that respondent's refusal to bargain with the Union was in violation of the Act; (2) nor to support the finding that respondent discharged the employee Arthur Cross because of his union activities; (3) nor to justify the finding that respondent violated Section 8(a) (3) and (1) in paying returning strikers diminished Christmas bonuses.

■ *The refusal to bargain.* The respondent characterizes the Board's finding respecting respondent's refusal to bargain with the Union as "the keystone of the entire structure" of the Board's case and it is very earnestly insisted

that the refusal to bargain by respondent's president Mr. Newell was "in good faith and not in bad faith." It is not contended that the examiner failed to report and discuss the evidentiary and ultimate facts upon which determination of the issue had to be made, but the argument is that the examiner's statement of certain of the facts which tend to support respondent's claim of good faith "reflect the only logical and impartial answer to the question upon a consideration of the whole record." However, the record shows that both the examiner and the Board found from the evidence as a whole that the refusal to bargain was not made in good faith for just cause. The refusal to bargain necessarily delayed cohesion in action of the employees and collective bargaining, and the examiner found that the president intended that natural consequence of his act, and that he acted to gain time to destroy the majority which the Union had.

The Board unanimously adopted these findings and we do not find on the whole record that there is a lack of substantial evidence to support them. It is true president Newell testified that he "doubted their [the Union's] majority", "didn't believe they had a majority." He referred to "similar experiences several times before" and said "it had always come out in the end that we had the majority or at least we won the election."

But the evidence showed that the respondent, on hearing of the employee's organizational activities, interrogated the drivers concerning their union affiliation and activity and threatened reprisals. In addition the president, Newell, personally discharged Cross who was the main leader in the organization campaign. After the strike began, Newell continued efforts to undermine the Union by soliciting several strikers to return to work on the promise of better working conditions for them. In answer to the direct question put to president Newell whether there was anything to indicate to him that the Union did not have the majority which it in truth and in fact did have, he answered:

"A. Yes, because there are a lot, you take out of 80 men, there would have to be quite a number there to have a majority and seeing these groups grouped around the yard there at different times, there would only be three or four or five in a group, well, I didn't know how they were getting along and now if I had seen 50 or 60 out in a group or something like that, I could understand they had a majority."

Mr. Newell took the position that the Union would have to establish its majority by an election before he would recognize it and there was substantial evidence to justify the inference that he was counting on "coming out in the end with a majority" or "at least winning the election" rather than upon having any real doubt of the fact that the Union then had a majority. He made no inquiry of the Union's agents or, so far as it appears, of any one else as to who constituted the majority for the Union which then existed, but merely engaged in acts violative of the Act which were adapted to suppress it. The Board's finding that respondent's refusal to recognize and bargain with the Union was in violation of Section 8(a) (5) and (1) of the Act is supported by substantial evidence and is sustained.

■ *The discharge of Arthur Cross.* The evidence was that Cross worked for respondent in 1949 and after voluntarily leaving for a short time, was rehired in 1950 and worked more than two years. He was known as a good worker and two days before his discharge was assured by his supervisor Cotrell that he was in line for new equipment that would enable him to make more money. He was the prime mover for unionization and was the one who got in touch with the Union officials and had two agents of the labor Union come to El Dorado and he worked with them soliciting for the Union. He was the man who arranged for a meeting of the Union representatives and the truck drivers at the so-called Palace Drive Inn on the edge of the town.

On the next day after that meeting, he drove a truck on company business and when he came back from the job about dark, he was sent to the president's office and was summarily discharged and paid off with Mr. Newell's personal check. According to Cross, Mr. Newell told him "that his work was satisfactory from the time he got here until now." Cross testified that when he asked "Mr. Bob" [Newell] why he was being fired, "he looked up at me and he said, 'you talk too much' and he handed me my check." "I says 'when you go ask for a job' I says 'usually they ask for a reference'. I said 'I want to know what I can do about that' and he says 'Have anybody to call me, write me or any other way you want to I will guarantee you good reference'."

Mr. Newell said he knew that Cross had been active for union organization on a previous occasion and he believed him to have been "one of the most active." Newell also said of Cross that it "Seems like he carried his party." Mr. Newell also said, "I think we knew there was some [union activity] going on [in the week preceding the discharge of Cross]." It appeared that Cross had told supervisor Cotrell of his organizational plans and Cotrell informed another employee (Dutton), in connection with a threat that Newell would close up before he would recognize the Union, that "Newell knew everything that was going on, that one of the other drivers was getting cards signed and was telling him who was signing." Cross was out in the open with his organizational efforts during the several days before his discharge.

Respondent's position in respect to this issue was that Cross was discharged because he complained too much. The testimony of several witnesses was adduced to support the claim and it appeared that Mr. McHenry, the night dispatcher, told Mr. Newell on the morning of Cross's discharge that he, McHenry, was tired of it and that Newell could keep either him or Cross. But there was evidence that McHenry told one of the drivers that he had originally thought that he need not worry about him [the driver] supporting the Union but that the driver had "sure fooled him." McHenry also informed three of the drivers that Newell did not like Unions and would not recognize one. He also stated that if the employees were organized, Newell would "put a Markel man on us," Markel being agent for respondent's insurance carrier which had periodic road reports made on all drivers. Also that Newell would find excuses to get rid of any one, would cut the work week to 40 hours and would impose strict physical examinations which several of the employees [naming them] could not pass.

Although the testimony about Cross's complaining is extended, it presents no instances either far back in his employment or at or near the time of his discharge where his complaining was such as to evoke any reprimand or warning to him in respect to it. There is no proof of its being any worse at or near the day of his discharge. That day was immediately after the arrival of the Union organizers in El Dorado at Cross's instigation and Cross's organizational activities with them, and in consideration of the sudden and abrupt nature of the discharge, the unconvincing character of the asserted grounds for the discharge and respondent's opposition to the unionization, the Board was not bound to believe that the asserted grounds were the real grounds. The discharge tended to hinder the unionizing and the Board could fairly find that such was the reason for it. The finding that the discharge was in violation of Section 8(a) (1) and (3) of the Act is supported by substantial evidence and is sustained.

*The Christmas Bonus.* For a period of 10 to 12 years, including the year 1952, respondent customarily paid its employees a Christmas bonus. While the bonus was not related to wages earned, and was not given pursuant to any contract or commitment, the amount of money delivered to the individual employee was determined by rule and depended on each

one's seniority in service. Those having six months service or less would receive $25 and for each additional half year of service, the amount would be increased by $25 up to a maximum of $250. Eight strikers who returned before Christmas were paid only the minimum bonus of $25 instead of the amounts which they would have received in ordinary and usual course on account of their accumulated seniority. Newell explained this was because "they were new men." The non-strikers received their regular bonus.

The Board found that by treating the returning strikers as new employees and depriving them of their accumulated seniority for the purpose of computing their bonuses, respondent discriminated as to the hire and tenure of their employment in violation of Section 8(a) (3) and (1) of the Act.

■ The respondent contends that as its refusal to recognize or bargain with the Union was not violative of the Act, the strike which followed that refusal was not an unfair labor practice strike and therefore the returned strikers were not entitled to any seniority. It also contends that the Board's finding in respect to the bonuses should be reversed for the reasons assigned in the dissent of Board member Murdock. 111 N.L.R. B. No. 43. It points out that there are no controlling court decisions holding with the Board as to bonuses and argues that as no employee had any actionable right to demand the bonus, the Board had no power to enter the order for payment.

We do not sustain the contentions. The Board's ruling that respondent's refusal to recognize the Union was violative of the Act having been sustained, it follows, under well settled law, that the ensuing strike was an unfair labor practice strike. All participants therein were entitled to reinstatement on application without prejudice to their status. Section 2(3) of the Act; N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381; N. L. R. B. v. Stilley Plywood Co., Inc., 4 Cir., 199 F.2d 319, 320-321, certiorari

denied 344 U.S. 933, 73 S.Ct. 504, 97 L. Ed. 718; N. L. R. B. v. Thayer Company, 1 Cir., 213 F.2d 748, 752, certiorari denied 348 U.S. 883, 75 S.Ct. 123, 99 L.Ed. 694. The Board so found and the finding is sustained.

Though we do not find direct precedent involving bonuses, we need not ignore the fact that the practice prevails in industry of distributing bonuses among employees according to known rules which relate the amount to the seniority of the employee. It has to do with sustaining morale and becomes of importance to all concerned. The Court may not prevent the Board from taking cognizance of a resort to discrimination in connection with the practice.

■ The action of respondent in denying the seniority right of those employees whose work "has ceased * * * in connection with any * * * unfair labor practice", Section 2(3), and discriminating between them and the non-striking employees in respect to bonuses comes squarely within the prohibition of Section 8(a) (3) of the Act. Seniority rights are basic conditions of employment and respondent's discriminatory denial of them to the particular employees discouraged membership in the labor organization in violation of the Act. The respondent presents no suggestion as to what the Board ought to do about such a violation. We find that the remedial order of the Board herein by which the respondent is required to revoke the discrimination practiced against the striking employees and to accord them their seniority in computing the amount of their bonuses is not capricious or arbitrary but is appropriate and in accord with intendment of the Act.

It is unnecessary in this proceeding to reiterate the controlling law applied to our review of the fact questions here presented as it has been fully and lately expounded in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Minnesota Mining & Manufacturing Co., 8 Cir., 179 F. 2d 323; N. L. R. B. v. Cold Springs

Granite Co., 8 Cir., 208 F.2d 163; N. L. R. B. v. Pacific Intermountain Express Co., 8 Cir., 228 F.2d 170.

Enforcement of the order as prayed is awarded.