397 F.2d 956
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
FRICK COMPANY, Respondent, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, AFL-CIO, Intervenor.
 No. 16892.
 United States Court of Appeals Third Circuit.
 Argued March 8, 1968.
 Decided June 17, 1968.
 
 COPYRIGHT MATERIAL OMITTED John Nevins, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Paul J. Spielberg, Attorney, N. L. R. B., on the brief), for petitioner.
 Bernard G. Link, Baltimore, Md., for intervenor.
 Lacy I. Rice, Sr., Rice, Hannis, Rice & Wagner, Martinsburg, W. Va. (Lacy I. Rice, Jr., John M. Miller, Martinsburg, W. Va., on the brief), for respondent.
 OPINION OF THE COURT
 Before BIGGS, SEITZ and VAN DUSEN, Circuit Judges.
 BIGGS, Circuit Judge.
 
 
 1
 The National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), seeks enforcement of its order against the Frick Company based on a finding that the latter violated Sections 8(a) (1) and (3) of the Act by dropping[1] union employees from its payroll and by depriving them of earned vacation benefits because they engaged in an economic strike. The Board also based its order on a finding that Frick had violated Section 8(a) (1) by threatening striking employees with the forfeiture of vacation benefits and the loss of job rights; by dealing directly with the strikers in an effort to induce them to abandon the strike; and by engaging in surveillance of strikers who were soliciting funds to support the strike.[2]
 
 
 2
 The relevant facts are as follows. After a one day strike, Frick agreed, on April 1, 1965, to recognize the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO, as the bargaining representative of the production and maintenance employees of its Waynesboro, Pennsylvania plant. Between April 5 and May 14 the parties, except for one minor exception, met on Monday and Friday of each week in bargaining sessions aimed at concluding a mutually satisfactory collective bargaining agreement. The sessions resulted in an impasse and consequently, on May 17, the union called a strike.[3]
 
 
 3
 At some time subsequent to the meeting on May 14, the following form was prepared for all employees who went on strike on May 17 and in accordance with its terms was marked to be effective on May 24. A copy was made for each employee and placed in his official file.
 
 "CHANGE IN EMPLOYEE'S STATUS
 
 4
 Employee Clock Effective
Name........... No......... Date 5-24-65

Detail of Removed from payroll as a
 Quit effective
Change May 24, 1965; absent seven
 calendar days on unauthorized
 basis.
 
 
 5
 Absence is in violation of the following paragraph extracted from page 2, under [sic] heading Tardiness-Absence, in booklet Frick Employees' Manual, Rules and Regulations, August 1956:
 
 
 6
 An employee absent seven (7) consecutive calendar days for an unauthorized or unexplained reason will be considered to have quit the employ of the Company. His name will then be removed from the payroll.
 
 
 7
 Authorized Signature RICHARD C.
 HOFF
 Director of Industrial Relations"
 
 
 8
 The manual was given to every new employee and explained to him. Its provisons were in effect during 1965 and for many years prior thereto.
 
 
 9
 Subsequently, on or about July 8, the following letter was mailed to all hourly paid employees:
 
 
 10
 "July 8, 1965
 
 Dear Fellow Worker:
 
 11
 You have one more opportunity to qualify for Vaction Pay this year.
 
 
 12
 You will receive a Vacation Pay check on July 16, in accordance with standard practice, provided:
 
 
 13
 You return to your job, and thereby have your name again placed on our payroll, on or before July 14.
 
 
 14
 And, work on July 14, 15 and 16.
 
 
 15
 There is no other way.
 
 
 16
 If you do not work on the three days cited above, eligibility for Vacation Pay
 
 
 17
 this year will be forfeited.
 
 
 18
 Are you going to return to work and thereby become eligible for Vacation Pay?
 
 
 19
 It's up to you.
 
 
 20
 Sincerely yours,
 T. M. GLEN
 Vice President & General
 Manager
 Refrigeration Division"
 
 
 21
 The standard vacation plan operative at the Frick plant provided for vacation pay on a graduated scale after one year or more of active employment, as of the pay period ending the nearest June 30th. Any employee who had worked at least 75 percent of the pay periods during the preceding year, subject to exceptions not here material, was entitled to the benefits of the plan. The vacation week was fixed as the third full calendar week in July of each year, which was in 1965 the week bginning on July 19, and payment was fixed for the week preceding the vacation week. However Section 8 of the plan reads as follows: "No vacation or vacation pay will be allowed or paid to any person who is not on the payroll of the Company on Wednesday preceding the week in which vacation pay is distributed."
 
 
 22
 Thus the action of the Frick management in removing from the payroll the names of the striking employees brought into play the terms of Section 8 of the vacation plan. This action had the effect of denying all vacation benefits to the strikers unless they returned to their jobs.
 
 
 23
 Beginning about July 9 and extending into August, Frick, through its supervisors, attempted to persuade the striking employees to return to their jobs through personal contact both at the picket line and at the employees' homes and over the telephone. The Trial Examiner found, from the testimony of supervisors Kirkpatrick, Orner, McNew, Poole, and Martin, that some of these overtures included statements relating to vacation pay forfeiture similar to that contained in the company's letter dated July 8. It was also found that some employees, according to the testimony of employees Riber, Stoops, Beard, Hartman, Plum, Carbough, and Nunemaker, were told by the supervisors that if they did not return to work on the date given they would have no job or would have to be hired as new employees.
 
 
 24
 It is undisputed that on July 9 Frick's Industrial Relations Director Hoff and Chief of Plant Guards Miller drove to the entrances of the Fairchild plant and the Mack Truck plant in Hagerstown, Maryland for the purpose of taking photographs of those individuals who were soliciting strike funds in behalf of the Frick strikers and that seven photographs were taken of the solicitors, among whom were Frick employees, for the purposes of identification.[4]
 
 
 25
 The Trial Examiner concluded that Frick committed unfair labor practices in violation of Sections 8(a) (1)[5] and 8(a) (3)[6] of the Act by threatening the strikers with loss of vacation pay, loss of job, of rehire only as new employees, of refusal of a recommendation for another job; by failing to pay vacation benefits to the strikers; by dealing with employees in an effort to persuade them to abandon a strike which had become an unfair labor practice strike; and by engaging in acts of surveillance through photographing strikers who were soliciting strike funds at the plant gates of other companies.
 
 
 26
 The Trial Examiner further concluded that Frick's letter of July 8, received by the employees on July 9, or thereafter, had the effect of prolonging the strike and thus turned an economic strike into an unfair labor practice strike as of July 9. Consequently, the Examiner ordered Frick, in addition to paying the withheld vacation pay, to offer reinstatement to all strikers, with full privileges, who had been on strike on or after July 9 and had not been replaced as of that date and to make such employees whole for any loss they might have suffered by reason of Frick's refusal, if any, to reinstate them.[7] See Internation Union of Electrical, Radio and Machine Workers, Local 613 v. NLRB, 328 F.2d 723, 726 (3 Cir. 1964). The Examiner further ordered the same remedy for those strikers who were replaced subsequent to May 24 but prior to July 9 on the grounds that Frick's action of putting the strikers' names in the "Quit" file effective May 24, was a discriminatory discharge in violation of Section 8 (a) (3) of the Act. As noted the Board adopted the findings of the Trial Examiner and entered an order accordingly. We grant partial enforcement of that order.
 
 
 27
 We note primarily that we find substantial evidence in the record to support the Trial Examiner's conclusion that Frick violated Section 8(a) (1) of the Act by having its supervisors threaten the strikers with loss of their jobs, by improperly asserting that the strikers if they did not abandon the strike could only return, if at all, as new employees, and by taking photographs of the strikers as they solicited for strike funds. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).[8]
 
 
 28
 We turn to the finding that Frick violated Section 8(a) (1) and (3) in transferring the names of the strikers to its inactive "Quit" file and consequently depriving the strikers of their vacation pay. As has been noted previously in this opinion, the strikers were notified on July 9 or thereafter that the effect of their strike was to have their names taken off the payroll and thus cause them to lose their vacation pay unless they abandoned the strike and returned to work on the specified days. We agree with the Trial Examiner and the Board that this communication and the subsequent denial of vacation benefits was an unfair labor practice in violation of Section 8(a) (1) and (3).
 
 
 29
 Frick contends that, contrary to any evidence of the necessary "discrimination" required by Section 8(a) (3),[9] it merely applied a longstanding rule to the strikers as it would have applied to any other employee[10] who was absent from work for an unauthorized reason. As should be noted, the rule does not apply to all employees. It applies only to those employees who are absent for an "unauthorized or unexplained reason." Thus, under the company rule, Frick is free to authorize an absence for any purpose it feels desirable and refuse to authorize it for any purpose it feels undesirable. In the circumstances at bar it is undenied that Frick refused to pay vacation benefits to the strikers who were absent from work because of the strike when such benefits were paid to other employees. This action is discriminatory on its face and the burden is on the company to demonstrate the nondiscriminatory and business reasons for such conduct. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-379, n. 4, 88 S. Ct. 543, 19 L.Ed.2d 614 (1967).
 
 
 30
 In NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Supreme Court held that denial of vacation benefits to strikers and payment of those benefits to non-strikers created a potential injury to protected employee rights. In such circumstances, the Supreme Court stated, the employer must come forward with business justifications for his conduct. However, one could argue that the decision in Great Dane Trailers merely requires that an employer come forward with evidence of business justification in order to counter-balance the potential injury to employee protected rights after proof of discriminatory conduct has been presented and that mere denial of vacation benefits pursuant to a company rule is not substantial evidence of such conduct.[11] This contention has no merit, at least as applied in the circumstances at bar. Following the decision in NLRB v. Great Dane Trailers, Inc., supra, the Supreme Court decided NLRB v. Fleetwood Trailer Co., supra. In that case an employer had replaced some of his employees who were engaged in an economic strike. Upon termination of the strike the employees sought reinstatement. At the time of their request for reinstatement there were no available jobs. Subsequently, however, vacancies did occur and, instead of filling the vacancies with those employees who had been strikers, the company hired new employees. The Supreme Court affirmed the Board finding that Fleetwood had committed unfair labor practices in violation of Section 8(a) (1) and (3) of the Act, and stated, "Section 2(3) of the Act * * * provides that an individual whose work has ceased as a consequence of a labor dispute continues to be an employee if he has not obtained regular and substantially equivalent employment. If, after conclusion of the strike, the employer refuses to reinstate striking employees, the effect is to discourage employees from exercising their rights to organize and to strike guaranteed by §§ 7 and 13 of the Act * * *. Under §§ 8(a) (1) and (3) * * * it is an unfair labor practice to interfere with the exercise of these rights. Accordingly, unless the employer who refuses to reinstate strikers can show that his action was due to `legitimate and substantial business justifications' he is guilty of an unfair labor practice. NLRB v. Great Dane Trailers, [Inc.] 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967). The burden of proving justfication is on the employer. Ibid." 389 U.S. at 378, 88 S.Ct. at 545.
 
 
 31
 Thus, in Fleetwood the fact that the employer refused reinstatement to striking employees and subsequently filled those positions with "new" employees was sufficient evidence of discrimination to cast the burden of proving the contrary onto the employer. 389 U.S. at 378-379, n. 4, 88 S.Ct. 543. He may have had a variety of lawful reasons for such a refusal. See, e. g., 389 U.S. at 379, 88 S.Ct. 543. Certainly refusal to pay vacation benefits to employees engaged in protected activity also presents sufficient evidence of discrimination which demands that the employer bring forward proof to defend his action. Our examination of the record discloses no evidence presented by Frick showing how the "unauthorized or unexplained" absence rule had been applied in the past except for the bald statement by Director of Industrial Relations Hoff that it would apply to any employee.[12] This is not sufficient. "[S]trikers must be treated uniformly with nonstrikers with respect to whatever benefits accrue to the latter from the existence of the employment relationship." Great Dane Trailers, 150 NLRB 438, 439 (1964), rev'd sub nom. NLRB v. Great Dane Trailers, Inc., 363 F.2d 130 (5 Cir. 1966), rev'd, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); NLRB v. Wheeling Pipe Line, Inc., 229 F.2d 391, 394-395 (8 Cir. 1956); cf. Republic Steel Corp. v. NLRB, 114 F.2d 820 (3 Cir. 1940), modified on other grounds, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).[13],[14] That such discrimination tends to discourage membership in a labor organization can hardly be doubted. See NLRB v. Great Dane Trailers, Inc., 388 U.S. at 32, 87 S.Ct. 1792.[15]
 
 
 32
 Frick next asserts that, assuming discriminatory conduct, in the absence of employer action which is "inherently destructive" of the protected rights of employees the burden is on General Counsel in order to support an allegation that the company violated Section 8(a) (3) to prove that Frick applied its company rule to the strikers with an antiunion motivation, citing NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) and American Ship Building Co. v. NLRB, 380 U.S. at 300, 85 S.Ct. 955, 13 L.Ed.2d 855.[16] In NLRB v. Great Dane Trailers, Inc., supra, 388 U.S. at 34, 87 S.Ct. at 1798, the Court stated: "From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was `inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is `comparatively slight,' an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him."
 
 
 33
 Frick contends that the decision in Great Dane created a substantial change in the law as to when a company must come forward with evidence of business justification. Frick asserts that since the Great Dane case was decided on June 12, 1967 and the Trial Examiner's decision in the instant case was handed down on May 12, 1966, and the Board's order was dated November 16, 1966, the case at bar should be remanded to the Board to enable the company to present evidence of its business justification for transferring the strikers' names from the payroll to the "Quit" file.[17]
 
 
 34
 The Supreme Court in Great Dane, stated, "We granted certiorari to determine whether the treatment of the motivation issue by the Court of Appeals was consistent with recent decisions of this Court." 388 U.S. at 31, 87 S.Ct. at 1796. Thus, the Supreme Court held that the decision in Great Dane was merely a distillation of earlier pronouncements by that Court. We note that the Supreme Court did not afford the employer in the Great Dane case an opportunity to present evidence of business justification by ordering the suit remanded to the Board but rather remanded the case to the Court of Appeals with directions to enforce the Board's order.[18]
 
 
 35
 We now turn our attention to the appropriate remedy. We find substantial evidence in the record to support the Trial Examiner's and Board's finding that the letter of July 8 prolonged the economic strike and thus transformed it into an unfair labor practice strike.[19] Consequently, we grant enforcement of the Board's order as it relates to any striker who had not been replaced as of July 9, 1965. However, as noted earlier in this opinion the Trial Examiner and the Board extended the specified remedy to those strikers who were replaced prior to July 9. Keeping in mind the Board's broad discretion in fashioning remedies for violations of the Act, we do not agree that the extension can be appropriately ordered under the circumstances at bar. "It is settled law that where a strike, undertaken for economic reasons, is later converted into an unfair labor practice strike by the unlawful conduct of the employer, the employer may be held responsible for the consequences. Where, as here, his conduct results in a prolongation of the strike, he may be required, on order of the Board, to reinstate the strikers with back wages, less the amounts earned by them while on strike." International Union of Electrical, Radio and Machine Workers, Local 613 v. NLRB, 328 F.2d 723, 726 (3 Cir. 1964). Thus, the policy underlying the remedy of reinstatement is that an employer who engages in unfair labor practices, and not the strikers, should suffer the consequences if the strike should be prolonged by the unfair labor practice. In the case at bar there could have been no consequences arising from the single act of Frick's removing the names of the strikers from the payroll. It was only after the contents of the letter of July 8, presumably received by the employees on July 9, were communicated to the strikers could any consequence arise from Frick's unfair labor practice for obviously it was only then that the strike could have been prolonged because of the unfair labor practice. The Trial Examiner, despite the remedy he ordered, specifically stated, "this unlawful conduct [putting the strikers' names in the "Quit" file] could not have become an operative factor in prolonging the strike until July 9 or thereafter, and I so find." Joint Appendix, p. 56a, n. 45. Prior to July 9[20] Frick was free to permanently replace any of the striking employees. NLRB v. MacKay Radio & Telegraph Co., 304 U.S. 333, 345-346, 58 S.Ct. 904, 82 L.Ed 1381 (1938). Therefore, we will not enforce that part of the Board's order which requires Frick to reinstate those employees who were replaced prior to July 9 and to make such employees whole for refusal, if any, to reinstate them.
 
 
 36
 We will grant partial enforcement of the Board's order to the extent stated in this opinion.
 
 
 
 Notes:
 
 
 [1]
 We have used the term "dropping" advisedly. Actually what the Frick Company did was to transfer certain union employees' names from its active payroll file to its inactive "Quit" file
 
 
 [2]
 Frick was also charged with refusal to bargain in good faith in violation of Section 8(a) (5) of the Act but the Trial Examiner found against such a charge. His decision was affirmed by the Board, 161 NRLB No. 99 (1966)
 
 
 [3]
 Subsequent to the bargaining session on May 14, and during the strike, three other meetings were held, one requested by the Union and two requested by a Federal Mediator. None of the three resulted in breaking the impasse. See Trial Examiner's Decision, pp. 15a-20a of the Joint Appendix
 
 
 [4]
 In respect to these photographs the Trial Examiner found that supervisor Kirkpatrick had told striker Beard that the Company did not want striker Stoops to return to work saying, "Boy we got the goods on him, we got pictures and everything of him." Joint Appendix, p. 55a, n. 43
 
 
 [5]
 Section 8(a) (1), 29 U.S.C. § 158(a) (1), provides:
 "(a) It shall be an unfair labor practice for an employer —
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"
 Section 157, 29 U.S.C., provides:
 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."
 
 
 [6]
 Section 8(a) (3), 29 U.S.C. § 158(a) (3), provides:
 "(a) It shall be an unfair labor practice for an employer —
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."
 
 
 [7]
 An economic striker, unlike an unfair labor practice striker, can be permanently replaced by the struck employer. Compare NLRB v. MacKay Radio & Telegraph Co., 304 U.S. 333, 345-346, 58 S.Ct. 904, 82 L.Ed. 1381 (1938) with Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956)
 
 
 [8]
 We also find no merit in Frick's argument that the dispute is merely one of contract rights and that therefore the Board has no jurisdiction in the case at bar. See NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 30-31, n. 7, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967)
 
 
 [9]
 The unfair labor practices held to be based on Frick's transfer of the strikers' names from the company payroll, although found to violate both Sections 8 (a) (1) and 8(a) (3) are essentially based on a finding of a Section 8(a) (3) violation
 
 
 [10]
 Section 2(3) of the Act, 29 U.S.C. § 152 (3), states: "The term `employee' * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute * * *."
 
 
 [11]
 See 388 U.S. at 35, 87 S.Ct. at 1798. Mr. Chief Justice Warren stated: "Since discriminatory conduct carrying a potential for adverse effect upon employee rights was proved and no evidence of a proper motivation appeared in the record, the Board's conclusions were supported by substantial evidence * * *." But see note 13, infra
 
 
 [12]
 See pp. 127a-28 in Joint Appendix
 
 
 [13]
 We also note that, despite the assertion by Frick that it was merely applying a company rule to employees subject to that rule, in fact the letter of July 8 stated that the striking employees had to return to work on July 14, 15 and 16 in order to be eligible for their vacation benefits, when strict application of the company rule would require them to be at work only on July 14. This alone is substantial evidence, if it is contended that General Counsel has the burden of proving discriminatory conduct on the part of Frick, to support the Trial Examiner's finding of unlawful discrimination by Frick
 
 
 [14]
 The Frick vacation plan is not without ambiguity in that it requires employees be on the payroll "on Wednesday preceding theweek in which vacation pay is distributed." (Emphasis added). In 1965, the week in which vacation pay was distributed was the week of July 12, with the actual distribution day being July 16. Thus, a literal reading of the rule would seem to require in 1965 that the employees be on the payroll on Wednesday, July 7 rather than Wednesday, July 14. However, the company rule has been interpreted apparently to require presence on the payroll on the Wednesday preceding the day, rather than the week, in which vacation pay is distributed.
 
 
 [15]
 "Discouraging membership in a labor organization `includes discouraging participation in concerted activities * * * such as a legitimate strike.' National Labor Relations Board v. Erie Resistor Corp., 373 U.S. 221, 233, 83 S.Ct. 1139, 1148, 10 L.Ed.2d 308 (1963)." NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 32, 87 S.Ct. 1792, 1797 (1967)
 
 
 [16]
 The Trial Examiner in the case at bar did rest his conclusions, alternatively, on a finding that Frick's denial of vacation pay to the strikers was unlawfully motivated. See p. 50a of the Trial Examiner's Decision in the Joint Appendix. In light of the Supreme Court's decision in Great Dane we need not decide if there is substantial evidence to support that finding. See NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 380, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967)
 
 
 [17]
 See Mr. Justice Harlan's dissenting opinion in Great Dane, 388 U.S. 35, 37-40, 87 S.Ct. 1792 (1967)
 
 
 [18]
 Even if one were to adopt the view expressed by Mr. Justice Harlan, supra, note 17, that prior to the decision in Great Dane, an employer had no obligation to come forward with evidence of business justification unless the employer's action was "`inherently destructive of employee interests' that it may be deemed proscribed without [further] need for proof [by General Counsel] of an underlying improper motive," 388 U.S. at 33, 87 S.Ct. at 1797, we are far from certain that the circumstances of this case would not have put Frick on notice that it had to come forward with evidence of its business justification for taking the strikers off the payroll, in accordance with the principle established in NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963)
 Because we feel compelled by the disposition in Great Dane to grant enforcement of the Board's order without remanding the suit, we need not decide whether Erie Resistor is applicable to the case at bar, except to note that the employer in the instant case, unlike the employer in Great Dane, noted by Mr. Justice Harlan, 388 U.S. at 40, 87 S.Ct. 1792, informed the strikers of the possibility of their loss of vacation pay prior to the loss in an attempt to entice them to abandon the strike. There is also evidence in the case at bar that Frick had need of the services of the striking employees. See Joint Appendix, pp. 87a, 96a, 100a, 102a, 113a, 114a, 149a.
 
 
 [19]
 See, e. g., the testimony of strikers Nunemaker and Cool at 102a-103a, 113a in the Joint Appendix
 
 
 [20]
 It could be argued that July 9 was the date the employer communicated his discriminatory actions to the strikers but that there is no evidence that the strike was prolonged as of that date, rather than as of some other date, for example, July 14, when the vacation pay was forfeited. See note 19, supra. However, we cannot require that such an administratively infeasible burden be placed on the Trial Examiner and the Board. All that may be required is that the remedy designed by the Board fairly be said to effectuate the policies of the Act. 29 U.S.C. § 160 (c); Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 539, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943). It is one thing to hold, as we do, that it does not effectuate the policies of the Act to apply the reinstatement remedy to strikers who were replaced during a period of time when it was virtually impossible that the strike was prolonged by Frick's discriminatory practice. See Anchor Rome Mills, Inc., 86 NLRB 1120, 1122 (1949). It is a wholly different matter to make the same finding when the remedy is applied to strikers replaced after the discriminatory action was communicated to the employees