**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PEERLESS PRODUCTS, INC., Respondent.**

No. 12444.

United States Court of Appeals Seventh Circuit.

March 17, 1959.

Thomas J. McDermott, Associate Gen. Counsel, Betty Jane Southard, Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Simon Herr, Chicago, Ill., for respondent.

Before DUFFY, Chief Judge, HASTINGS and KNOCH, Circuit Judges.

HASTINGS, Circuit Judge.

Upon the petition of the National Labor Relations Board (the Board) we are asked for enforcement of its order of May 15, 1958, issued against respondent, Peerless Products, Inc. (the Company),[1] following the usual proceedings under Section 10 of the National Labor Relations Act (the Act), as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq. The Board's decision and order are reported at 120 NLRB No. 136.

In affirming the determination of the Trial Examiner the Board found that the Company violated Section 8(a)(1) of the Act by interfering with the organizational affairs of its employees through interrogation, threats and withdrawal

1. The Company is an Illinois corporation with its office and plant in Chicago, Illinois, and is engaged in the manufacture, sale and distribution of punch boards, and is engaged in commerce within the meaning of the Act.

of economic benefits because of its employees' activities on behalf of the Allied Crafts Division, United Textile Workers of America, AFL–CIO (the Union). The Board further found that the Company violated Section 8(a)(3) and (1) of the Act by discriminatorily discharging an employee, Mary Britt, in retaliation for her union activities, including her attendance at a Board hearing, and by refusing to reinstate employees, Mary Benson and Verbie Lee Nichols,[2] following an unfair labor practice strike protesting the discharge of Britt.

The Company employed about 20 persons, mostly women, and was operated by Marshall Maltz, as president, and his father, Benjamin Maltz, as general manager. Early in February, 1957, employee Britt was consulted by a Union representative about organizing her fellow employees and during the following week signed up the first five members, including Benson and Nichols. Union meetings were held in February and early March, and Britt was selected as chairman of the organizing committee which also included Nichols. It was agreed that if any employee were discharged or laid off because of union activities all would walk out. After fifteen of the employees had signed union cards, the Union filed a petition for certification with the Board, and on March 4, 1957 the Company was notified of the Union's representation claim. The next day the Company sent a letter to the Board's Regional Director challenging the Union's representation claim. The representation hearing was held on March 19 and was attended by the two Maltzes and most of the employees.

Britt was discharged on March 25 (under circumstances later set out), and there was a general protest strike by the employees from March 25 to March 27 when the Union made an unconditional offer on behalf of all employees to return to work. In the meantime, fearing a prolonged strike, Maltz had canceled orders and instructed his salesmen not to accept new ones. As the strikers came back to work, Maltz told various ones he would call them back as they were needed.

Between March 28 and April 23, the Company reinstated all of the strikers except Benson and Nichols. The Company scheduled overtime work after May 5; and, on July 2, began hiring new employees, without recalling Benson and Nichols. The representation election was held on June 3, 1958, and the employees, at that time, voted 15 to 1 against the Union. Hearings were held by the Trial Examiner on the unfair labor practice charges on September 24, 25 and 30, 1957; and, on September 30, the Company declared its willingness to reinstate Benson and Nichols. It was agreed that back pay for them would terminate as of that date and that it would not be necessary to enter an order that the Company reinstate them.

After being notified on March 4 of the representation petition, both the president and general manager of the Company, at various times, interrogated the employees about the progress of the union campaign. Most of the employees denied having signed Union cards. During the course of this interrogation the employees were told they could have a union if they wanted one, and there was substantial evidence indicating that the one isolated statement found to have been a threat was in truth uttered in jest. The Trial Examiner found that Benjamin Maltz was "a frank, straightforward, and honest witness" and there is nothing to indicate that Marshall Maltz was otherwise.

The evidence shows that both President Maltz and Manager Maltz made small *personal* loans from time to time through the years to many employees, repayment being made in installments. The last loan made to Britt was about the middle of February when she bought a watch from Marshall Maltz for $21,

---

2. The Company did offer to reinstate these employees on September 30, 1957 after hearings on the unfair labor charges had been held.

paying him $3 in cash. The next week she paid him $3 leaving a balance of $15. On Friday, March 22, the first pay day after the Board representation hearing, Benjamin Maltz called Britt into his office and demanded payment of her loan. He took similar action against other employees with outstanding loans. All of the affected employees, except Britt, made satisfactory arrangements for repayment of their loans. There is no showing that the demands for repayment were accompanied by threats.

■■ Upon consideration of the record as a whole we have concluded that the interrogation of the employees was not intended to and did not interfere with their organizational activities, that there were no coercive threats made to them, and that the calling in of the small personal loans for repayment did not constitute a withdrawal of economic benefits by the Company in violation of Section 8(a)(1) of the Act. At best these charges were petty and trivial. The burden was upon the Board to establish the alleged independent violation of this section of the Act and it did not sufficiently discharge this burden. We hold that the cease and desist order directed to these allegations will not be enforced, and the order against the Company is modified by deleting these portions.

With reference to the discharge of Britt, the facts are that when she was called into the Company office, Manager Maltz told her he wanted to deduct the $15 balance she owed him from her pay check. She explained to him that she had bought the watch, which had been in the Company safe for two years, and that she would pay her debt, but refused to allow him to deduct the $15 from her pay check in one lump sum. Maltz replied, "I want my money", and Britt responded that she would repay it but that Maltz would have to "garnishee" her if he wanted to deduct $15 out of her pay. She then left the office. After she left the plant Maltz pulled her time card from the rack. When she returned to work the following Monday she found her time card missing (indicating her discharge), and the protest strike followed immediately. Maltz then called Britt into the office again and tendered her the pay check, told her to forget the $15, and added, "Just take the money direct and go because under the circumstances, I don't think you should work here any more." Later that day, following a protest of the discharge by the Union representative, Maltz told him he did not want Britt around any more and called her a "trouble maker." There was more conversation in which Maltz said he had had some bad experiences with unions and that he felt Britt was no longer a "trusted employee." Attempts to persuade Maltz to rehire Britt were unsuccessful.

■ In an attempt to justify its conduct, the Company claims that Britt quit her job, or that, whether she quit or not, she was guilty of insubordination and it had a legal right to discharge her. Of course, an employer has the right to discharge an employee for any reason or for no reason, if the discharge is not in reprisal for union activities. N. L. R. B. v. Sawyer Downtown Motors, Inc., 7 Cir., 1954, 213 F.2d 514, 516. However, under the circumstances surrounding Britt's dismissal, the finding of the Board that Britt was discharged in retaliation for her union activities is "supported by substantial evidence 'when viewed in the light that the record in its entirety furnishes.'" N. L. R. B. v. Wagner Iron Works, 7 Cir., 1955, 220 F.2d 126, 133. There is support in the record for the further finding that Britt's conduct with reference to the demand for repayment of the $15 was not "the motivating factor" behind her discharge or the subsequent refusal to reinstate her.

■ Nichols and Benson were reinstated by the Company on September 30, 1957; and there is no question but that, to be made whole, they are entitled to back pay up to the date of reinstatement and beginning with the time their services were again needed by the Company and certainly not later than July

2, 1957, when new employees were being hired.

We hold, therefore, that the parts of the Board's order relating to the affirmative action to be taken with reference to reinstatement of Britt and to make whole Britt, Nichols and Benson for loss of pay suffered by reason of the discrimination against them will be enforced.

The order of the Board as modified by this opinion will be enforced.