**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COSCO PRODUCTS COMPANY, Respondent.**

No. 18117.

United States Court of Appeals
Fifth Circuit.

June 30, 1960.

Petition for Modification of Opinion
Denied Sept. 13, 1960.

James C. Paras, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin J. Welles, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Theo. Hamilton, Hamilton & Bowden, Jacksonville, Fla., for respondent.

Before HUTCHESON, JONES and WISDOM, Circuit Judges.

HUTCHESON, Circuit Judge.

This matter is here upon the petition of the Labor Board for enforcement of its decision and order,[1] 123 N.L.R.B., 91, issued April 16, 1955.

The respondent, insisting that the board has not sustained its statutory burden of proof to establish, by substantial evidence on the record considered as a whole, the unfair labor practices of which it found respondent guilty, urges upon us that enforcement of the order should be denied.

We agree. While the hearing dragged out to an inordinate length, due, in part to the examiner's apparent misunderstanding of his independent function as an impartial trier, his active and partisan participation in the hearing, therefore, as an examiner and cross-examiner of witnesses,[2] in part to the fact that most of the employee witnesses were uneducated, indeed illiterate, and in part to the misunderstanding by examiner and counsel of what was relevant and what was not, and the completely wasteful consumption of time, therefore, in putting on wholly irrelevant testimony, such as interrogating at length Platt, union organizer, and the board's employee witnesses *as to what they thought the company meant by its promulgated rules*, the real case [3] was in comparatively small compass.

1. In it the board found: (1) that respondent had violated Sec. 8(a) (1) of the Act "by interfering with, restraining and coercing its employees in the exercise of their organizational rights; (2) that respondent violated Sec. 8(a) (3) and (1) of the Act by discharging employee Vandergriff; (3) that respondent violated the same provisions in Sec. 8(a) (4) of the Act by discharging employee Gibbons and constructively discharging employee Wilcox for engaging in union activities and for testifying in board proceedings; (4) that respondent, in violation of Sec. 8(a) (5) and (1) of the Act, failed to bargain in good faith.

2. e. g. King, 306–321; Altman, 341–369; Appendix to Petitioner's brief.

3. Respondent has its place of business at Jacksonville, Florida, where it has a small plant engaged in the fabrication of steel products.

The respondent company is headed by Mr. B. F. King, president; Mr. Norman E. Runyon, Jr., vice-president; Mr. G. W. Connors III, sales manager; and Mr. Richard Altman, shop superintendent, each of whom testified at the hearing.

At the peak of employment, in August, 1957, its biggest month, respondent had 25 regular employees which, decreasing because of a decline in business, had dropped in the spring of 1958, when the hearing in this case was held before the examiner, to a low of 13.

Mr. King first learned of the union activity among respondent's employees upon receipt of a letter on August 14, 1957, from Shopman's Local Union No. 741, International Association of Bridge, Structural and Ornamental Iron Work-

As a result of such a trial so conducted, it was inevitable that the examiner's intermediate report would be a lengthy argumentative apologia of nearly 100 printed pages, written in the spirit and couched in the language not of adjudica-

ers, AFL–CIO (hereinafter called the Union) requesting recognition as bargaining agent.

The month of August, 1957, was the best month, so far as production was concerned, that the company had ever experienced. After the month of August production dropped 67% from 659 tons in August to 219 tons in December 1957. During the month of August, 1957 the company had to adopt a "crash program" and produce far beyond the normal range of production, working 52–55 hours per week and working on Saturday which usually is not a work day. At the time of the hearing usual work weeks were of 40 hours with an "occasional hour or two of overtime".

On August 19, 1957, the Union filed a petition with the Board seeking certification as bargaining agent for Respondent's production and maintenance employees. An election was held on November 22, 1957, in which 21 employees voted, eleven for the Union and ten against the Union. The Union was certified on Dec. 3, 1957, but did not present its contract proposal to the respondent until Feb. 5, 1958, at the first meeting of representatives of the two parties. The Union did not at that time nor at any other time up to the hearing make any proposal on wages. However, the proposal was a bulky document of some 57 typewritten pages. The meeting on Feb. 5 was only for a short period of time and the only thing done was presentation of the Union's proposal to the company. The company's proposal was mailed to the Union on Feb. 28.

There were three other negotiation meetings, March 20, April 2 and April 17, the parties meeting, except for lunch from about 10 A.M. to about 4 P.M. each day. It was understood that meetings would continue after the hearing. A meeting was scheduled for May 14, which was later canceled because of the undue length of the hearing.

The hearing began on May 6, 1958, continued through May 9, resumed for one day May 12, then was recessed to May 26, and continued through May 30, recessed to and concluded on June 2, a total of eleven days of taking testimony.

The Trial Examiner issued his intermediate report on Nov. 18, 1958, recommending that respondent be required to reinstate four former employees, D. C. Vandergriff, Oscar Wilcox, Joe E. Brinson and Tom Gibbons, bargaining with the union upon request and cease and desist from certain alleged interference, restraint and coercion of employees and to post specified notices. The respondent and the General Counsel filed exceptions to the Intermediate Report.

The Board's order followed the Trial Examiner's recommendations in some respects but did not in others. While the Board found that Respondent was guilty of interference, restraint and coercion in violation of Sec. 8(a) (1) its order states that it relied "only" upon certain specified actions of respondent between Aug. 14, 1957, when the union requested recognition, and Nov. 22, 1957, the date of the Board election. The board also rejected the Trial Examiner's recommendation that respondent be required to reinstate Joe E. Brinson.

The Board found also that respondent had refused to bargain in good faith with the union because of (1) respondent's alleged "insistence as a condition to entering into a contract" that the union post a performance bond or have the International Union sign the contract, although at the time of the original refusal to bargain charge (Mar. 24, 1958) the parties had had only two negotiation meetings (Feb. 5, 1958 and March 20), one of which was merely for a few minutes during which the union presented its proposal for a contract. At the time of the hearing the parties had barely started negotiations. The union's proposed contract of fifty-seven pages was an extremely complicated, detailed and exacting document. Most, if not all, of the proposal would have imposed upon the respondent's small operation rules, conditions and limitations which were entirely foreign to its business and its existing methods. For example, the Union proposal contained detailed specifications for hours, pay, lunch period and the like for a 24 hour a day operation of three shifts. Another such clause was the one relating to layoffs for lack of work under which respondent would have been required to interview employees four work days before a layoff to find out whether or not such employees wanted to claim any work still available. Another clause of this type was the section on Shop Stewards. The union proposed that the respondent recognize and deal with at least three shop stewards— for a plant personnel of 13 employees. Such clauses as these, however desira-

tion but of advocacy. N. L. R. B. v. Ray Transport Smith Co., 5 Cir., 193 F.2d 142. Cf. N. L. R. B. v. National Paper Co., 5 Cir., 216 F.2d 859. Unable to approve it, the board adopted "the findings, conclusions, and recommendations of the trial examiner only to the extent that they are consistent herewith", and stating: (1) "We find, in agreement with the trial examiner that the respondent interfered with, restrained, and coerced its employees in violation of Sec. 8(a) (1) of the Act.", it added: "However, in so finding, we rely only upon the following actions by the respondent." (setting them out).

Further stating: "(2) We find, in agreement with the trial examiner, and for the reasons given by him, that the respondent discriminatorily discharged employee Vandergriff * * * constructively discharged Oscar B. Wilcox * * discriminatorily discharged Tom Gibbons * * *", it also stated: "(3) We find, in agreement with the trial examiner and for the reasons given by him, that the respondent refused to bargain * * by its admitted insistence as a condition to entering into a contract, that the certified union, and the International * * * post a $100,000 performance bond, or in lieu thereof, that the International also sign the contract."; and that "respondent violated Section 8(a) (5) by its refusal to honor the union's request for wages and personnel data."; and further "that the respondent on and after February 5, 1958, failed to bargain in good faith * * *."

As a preliminary to stating our reasons for refusing enforcement of the board's order, we think we cannot state too strongly: that the real, the relevant facts, on which the determination of this matter rests, are not complicated and, generally speaking, are not seriously in dispute; and that, where there are disputes, *the wholesale resolution by the examiner in favor of the board's witnesses and the board's equally wholesale adoption of this resolution in a note to its opinion are as injudicious as they are unjudicial, as indefensible as they are surprising.*

■ Dealing with the board's findings in the order above stated, we begin by saying, of the items (a) to (f) in its Finding No. 1, purporting to be statements made to employees by Altman, Runyon and King: that, if accepted as occurring as found by the board, they are not unfair labor practices; that they are within the ambit of the protection of the the right of free speech; and that the finding by the board, that they are unfair labor practices, is in direct violation of Section 158(c) of the Act, 29 U.S.C.A. § 158(c):

"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." [4]

■ Of the findings, that on Oct. 1, the respondent committed an unfair labor practice, "g" by issuing a set of working rules, and "h" by tightening up its policy with respect to making personal loans, it is, we think sufficient to say that it is dif-

---

ble or necessary the might be in a large plant, were wholly inapplicable to respondent's little business. It was obvious that the union was attempting to require respondent to conform to contractual provisions which were in effect in large plants and which without doubt had been agreed upon by other employers after a great deal of negotiations, probably years of contractual relations.

While there were many sections of the union proposal which were so-called "cost" items, adding considerable expense to the company's operations, the union did not make any wage proposal.

4. N.L.R.B. v. Englander, 9 Cir., 260 F. 2d 67 at page 76; N.L.R.B. v. McGahey, 5 Cir., 233 F.2d 406; N.L.R.B. v. McCatron, 9 Cir., 216 F.2d 213; N.L.R.B. v. Mississippi Products, 5 Cir., 213 F. 2d 670.

ficult to understand how it could be an unfair labor practice for the company to make and issue working rules such as those issued in this case, and that it is even more difficult to understand how the board could make and support "the petty and trivial charge" that in respect of its handling of personal loans to its employees, which it was not obligated to make and made only as an accommodation, the respondent had committed an unfair labor practice. N. L. R. B. v. Peerless Products, Inc., 7 Cir., 264 F.2d 769, 770. In addition, the evidence does not support the findings as a matter of fact because the uncontradicted evidence of management shows that the rules were no different from what they had been except that they were put in writing, and that, because they had not been in writing, the employees, because of the laxity in enforcement, had been loafing and indulging in horse play and "shooting craps" on working time; and that the real complaint of the charges after the rules were posted was that the employees used to shoot dice, and that they had been stopped from shooting dice, washing up before before quitting time, and things like that, and had been made to quit playing and pushing and such horse play during working hours.

■ As to finding "i", there is nothing in the record which at all supports the view that the giving of the raises constituted unfair labor practices. On the contrary, the raises were given to nearly all the employees, wholly without discrimination as to whether they were for or against the union, and there can be no reasonable basis for the claim that they constituted an unfair labor practice.

■ As to finding "j", that on September 25, respondent disciplined employee Wilcox by demoting him from his regular job and transferring him to irregular work, and that this was done in reprisal for his sympathy with, and testimony in favor of, the union, the record may be searched in vain for evidence to support this finding. In the first place, there is no evidence except Wilcox's complaint that he was demoted or otherwise

discriminated against, and in the second place, there is no evidence whatever that what was done with respect to him was done because of his union activity. Here again surmise and suspicion have been made to take the place of proof.

■ Of finding No. 2, the discharges of Vandergriff and Gibbons, it is sufficient to say that, upon the evidence as a whole, the finding, that Vandergriff and Gibbons were discharged not for the causes assigned but for union activity, is absolutely without support in the record considered as a whole, and that the board's order for reinstatement in these cases is in direct violation of the statutory prohibition against reinstating employees who have been discharged for cause. In the first place, there is no evidence whatever that, when the discharge of Vandergriff occurred in July, Altman knew that he was an active promoter of the union or had anything to do with it, none that he was not guilty of the faults for which he was discharged, and Altman having testified directly and positively to the reasons for his discharge and also that he did not know of Vandergriff's union activity, the board could not, upon nothing but the fact that Vandergriff was interested in the union and suspicion and surmise, reject Altman's uncontradicted and unimpeached testimony. N. L. R. B. v. Ingram, 5 Cir., 273 F.2d 670; N. L. R. B. v. Fox Mfg. Co., 5 Cir., 238 F.2d 211, 212; N. L. R. B. v. McGahey, supra; N. L. R. B. v. Ray Smith Transit Co., 5 Cir., 193 F.2d 142; N. L. R. B. v. Allure Shoe Co., 277 F.2d 231, and cases cited. Cf. Georgia Pacific Corp. v. United States, 5 Cir., 264 F.2d 161, and cases cited in note 4.

As to Tom Gibbons, *there is no evidence that he was discharged because he gave testimony under the Act,* and the evidence that he was insubordinate and profane is uncontradicted, except by his contrary statement, where as the testimony of Altman is confirmed by Monk Frost, and no one who had an opportunity to hear what was said in the final talk between Altman and Gibbons, except Gibbons, denied Altman's testimony that he

did make profane statements and that he was fired for them. Gibbons, himself, admits that he spoke to Altman in a very impudent manner, in a manner strongly reminiscent of the action of the discharged employees in N. L. R. B. v. Williamson-Dickie Mfg. Co., 5 Cir., 130 F.2d 260; and N. L. R. B. v. Times Ticayune, 5 Cir., 130 F.2d 257. He testified: "I said, 'You all been getting nasty around here since we came down to this hearing', and he told me, he said, 'You're fired'."

■ In these circumstances, the finding of the examiner and board that Gibbons was not insubordinate and insulting, as Altman had testified, and that he was not discharged for that cause but because Altman did not like his having testified, is completely contrary to the evident truth and right of the case. Such a finding is clearly contrary to the statute prohibiting restoration of an employee to a job when he has been discharged for cause and to the long line of decisions in this and other courts, both before and after the passage of the National Labor Relations Act, rejecting findings of examiner and board on inadequate evidence that a discharge was not for cause.

■ When it comes to Wilcox, the action of examiner and board is completely without basis in fact and in law. It is without basis in fact because there is no evidence, only *the suspicion of the examiner*, supporting the finding that Wilcox was demoted or transferred to a less pleasant job *because of his union activity*. In the second place, there is no basis in the statute or otherwise in law for the idea of a constructive discharge. The respondent either discharged the employee, that is put him off the job, or he did not. The most that could be made out of this case, if the board's finding, that Wilcox was, in violation of the statute, transferred from a job that he liked to others he did not like, had been sustained, would be to find that this was an act of interference, restraint, or coercion. It could not form the basis for a claim of discharge when, as matter of fact, the employee was not discharged but had voluntarily quit or left his job. N. L. R. B. v. Ingram, 5 Cir., 273 F.2d 670.

This court, in N. L. R. B. v. Newton, 5 Cir., 214 F.2d 472, at page 475, sustained the finding of unlawful discharge because the employees were actually forced to leave the plant and were refused access to it. The court held that this would in effect amount to a discharge, but it has never held, and in law it could not hold, that merely because a person does not like conditions existing on his job, he can quit and secure reinstatement with back pay on the claim that he was discharged. In short, while if a respondent, because of anti-union animus, is making it unpleasant for an employee to stay on the job, the board could find it guilty of unfair labor practices for doing so, as long as the employee is not discharged, the employee cannot, by voluntarily quitting his job, support a claim that he has been unlawfully discharged.

■ As to the finding that, by *insisting* on a bond and by refusing to furnish information, the respondent refused to bargain, we dismiss it with the statement that there is no evidence whatever in support of the view that the respondent *insisted, as a condition of bargaining,* upon any specific request, or that *it refused to give the union* any of the information requested by it, N. L. R. B. v. I. B. S. Mfg. Co., 5 Cir., 210 F.2d 634, and cases cited. All that the evidence shows is that in the short period of bargaining before it had to be adjourned in order to permit the union to press its charges against respondent in a hearing, the respondent did put forward on one or two of the bargaining days the suggestions to which examiner and board take exception.

Finally, as to the general catch all finding or failure to bargain, it is our view that, of the many cases which have been presented to this court on the issue of refusal to bargain, this case stands out as unique. Instead of union and respondent discussing amicably and with a view to arriving at a peaceful and satisfactory agreement, though the union was certified on December 3, 1957, it did not

present its contract proposal to the respondent until two months later, when there was a brief meeting, and, thereafter, because interrupted by the unfair labor hearings which the union was pressing for, there were only three other meetings. Under these circumstances, it is difficult to understand how examiner and the board could make a finding that there was a refusal to bargain.

The order is without support in the evidence, considered as a whole. Its enforcement is denied.