NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FIREDOOR CORPORATION OF AMER-
ICA, Respondent.

No. 240, Docket 26483.

United States Court of Appeals
Second Circuit.

Argued Feb. 14, 1961.

Decided June 9, 1961.

Glen M. Bendixsen, Atty., National Labor Relations Board, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer, Atty., National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Leo M. Drachsler, New York City (Sidney O. Raphael, and Raphael, Searles, Levin & Vischi, New York City, on the brief), for respondent.

Before LUMBARD, Chief Judge, and CLARK and SMITH, Circuit Judges.

LUMBARD, Chief Judge.

■ On the petition for the N.L.R.B. for enforcement of its orders against Firedoor Corporation, 127 N.L.R.B. No. 144, we have to resolve the usual question of whether there is in the record substantial evidence to support the Board's unfair labor practice findings and whether the orders are appropriate to remedy the conduct which the Board condemns. The Board found that the Firedoor Corporation had violated § 8(a) (1), (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158, by restraining its employees in their efforts to join Local 66 of the American Federation of Technical Engineers, AFL–CIO, by supporting and dominating the "Employee Bargaining Committee," a company union set up by Firedoor to compete with Local 66, and by discharging two employees because of their activity on behalf of Local 66. We find substantial evidence in the record considered as a whole to support the Board's findings, and accordingly we direct enforcement of its orders, which we hold to be appropriate remedies for the unfair labor practices committed. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

This dispute involves thirteen of Firedoor's employees who were engaged, as of November 1958, in drafting and related technical work necessary to the company's manufacture of hollow metal doors. The record supports the following findings of the Board:

Late in November of 1958, the union notified Firedoor of its claim to represent a majority of these men and petitioned the Board for an election. Shortly thereafter, Barry Mirsky, a supervisor of the technical work, asked seven or eight of the men, including Alvin Zeleznik and Richard Campagnola, who were later discharged, whether they were members of the union. All forswore membership. The next day, Mirsky asked the men to sign a petition addressed to the Board which stated that the union did not have their support. All but one refused to sign.

Thereafter on December 12, 1959, Firedoor's vice president, Bernard A. Schecter, spoke to the assembled employees, saying that signing the petition.

would have been a vote of confidence in the company, that certain benefits were cancelled and that, despite the election petition pending before the Board, the employees must immediately decide whether they opted for the union.[1] The employees did not make the decision as requested and Firedoor's next move was to have Mirsky convey President Bernard J. Sussman's offer to give them anything contained in a contract between the union and another manufacturer of metal doors if they bargained directly with the company and abandoned the union.

In January and February of 1959, President Sussman twice requested Zeleznik to assist him in his efforts to persuade the employees to abandon the union. In February, Vice President Schecter told trainees Angel Garbizu and Raymond Orsi that they could not have the second of promised quarterly pay increases "because of the union", telling Orsi that if he could "get those * * * damn guys in the back to drop out of the union the trainees would receive their raises."[2] Mirsky similarly explained the cancellation of the pay increases to Orsi. In March, as is discussed more fully below, Zeleznik and Campagnola were discharged.

With the Board-conducted election due to occur on April 23, Schecter addressed the eight remaining[3] employees on April 17. He told them their last chance to negotiate privately with the company was at hand and they decided to prepare a contract. After several hours of discussion and some negotiation, all during working hours (for which they were paid), a contract was agreed upon to become effective if the union lost the election.

The union was defeated by a 4–4 tie vote but apparently the agreement, which had provided little more than what was already in effect, was never executed.

■ The findings made by the Board were all supported by substantial evidence and clearly justify its orders that Firedoor cease and desist from threatening its employees with reprisals if they engaged in union activities, or did not engage in concerted activity supported by the company, and from promising benefits for the converse conduct. Equally proper was the Board's order that the employer cease and desist from dominating, interfering with or furnishing financial or other support to the Employee Bargaining Committee and from recognizing it or any similar committee as the representative of its employees.

1. The trial examiner found that the men immediately held a meeting at which they voted to put off their decision until the Board-conducted election and appointed a committee of four, including Zeleznik and Campagnola, to inform Schecter of their decision. When confronted by the committee, Schecter said that the employees had misunderstood his reference to the cancelled benefits and that the only cancellation would be of a proposal relating to work on the Fridays following Christmas and New Year's. In "an angry voice," however, he reiterated his demand that the employees make an immediate decision on whether to have a union.

The Board neither mentions this incident nor, apparently, rejects the finding.

2. At the hearing, Schecter testified that he had told the men that they could not be given the promised increases because the union would file charges alleging that the pay raise illegally influenced the men. The trial examiner found, however, that the union had notified Firedoor that it would not object to the increases. Even apart from this notification, the employer's statement might not have been made in good faith since the quarterly pay increase procedure had been agreed upon before the union's appearance. If not made in good faith it would have a coercive effect upon the men, assuming of course that they understood why the employer's claim was rebutted by the fact that the agreement antedated the union's appearance.

3. The decrease from thirteen to eight employees is accounted for as follows: Zeleznik and Campagnola were fired on March 13, and Albert Romano, Orsi and Garbizu resigned after February and before the April 17 meeting. None were replaced.

■ The Board also ordered the employer to cease and desist from "interrogating its employees as to their union * * * affiliations in a manner constituting interference, restraint or coercion." Though we think that this also should be enforced, it merits somewhat fuller discussion. In brief our conclusion is that Mirsky's interrogation of the employees was not an unfair labor practice, but that in light of the unfair labor practices committed after the interrogation the Board could infer that future interrogation might be coercive and, therefore, order Firedoor not to interrogate its employees in a coercive manner.

■■ Interrogation of employees is legal, when the questioning is not accompanied by any explicit threats, cf. N. L. R. B. v. Beaner Meadow Creamery, 3 Cir., 1954, 215 F.2d 247, if under all the circumstances coercion is not implicit in the questioning. Matter of Blue Flash Express, Inc., 1954, 109 N.L.R.B. 59; N. L. R. B. v. Armco Drainage & Metal Prod., 6 Cir., 1955, 220 F.2d 573, 582, certiorari denied 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748; N. L. R. B. v. Assoc. Dry Goods Corp., 2 Cir., 1954, 209 F.2d 593; N. L. R. B. v. Syracuse Color Press, 2 Cir., 1954, 209 F.2d 596.[4] The most relevant factors are whether there has been a background of employer hostility to and discrimination against the union [5] and whether the questions seem to seek information which the employer in good faith needs—as when individuals are asked whether they belong to the union so that the employer can check the union's claim to represent a majority [6] or, to the contrary, seem to seek information most useful for discrimination—as when employees are asked who organized the union or whether named fellow workers belong.[7] Other relevant factors are whether the identity of the questioner and the place or method of interrogation imbue the interview with an unnatural formality which tends to intimidate the employee and, to a lesser extent, whether the employees did conceal their allegiance or denied membership when they actually had not made up their mind and, therefore, became unwilling to take an active part in later organizational activity or even, in the case of a small unit, afraid to vote their true convictions at a later Board-conducted election. See Syracuse Color Press, supra; Blue Flash Express, Inc., supra [dissenting opinion].

The interrogation of the employees was not improper under these standards. There was no past history of anti-union discrimination; Mirsky had reason to check the union's claim of majority status for the claim came as a "complete surprise" to him; [8] the questioning was limited to whether the questioned employee belonged to the union; Mirsky worked closely with the men and questioned them in a casual manner. Though

---

4. See earlier cases holding that interrogation was *per se* illegal, Standard-Coosa-Thatcher, 1949, 58 N.L.R.B. 1358; N. L. R. B. v. Dixon, 8 Cir., 1950, 184 F.2d 521; cf. Texarkana Bus. Co. v. N. L. R. B., 8 Cir., 1941, 119 F.2d 480.

5. N. L. R. B. v. Hill & Hill Truck Line, Inc., 5 Cir., 1959, 266 F.2d 883; N. L. R. B. v. Wagner Iron Works, 7 Cir., 1955, 220 F.2d 126, 139, certiorari denied, 350 U.S. 981, 76 S.Ct. 466, 100 L. Ed. 850; N. L. R. B. v. Chautauqua Hardware Corp., 2 Cir., 1951, 192 F.2d 492; compare N. L. R. B. v. Protein Blenders, 8 Cir., 1954, 215 F.2d 749; N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 1952, 194 F.2d 370, certiorari denied, 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638.

6. Blue Flash Express, Inc. supra; N. L. R. B. v. Peerless Products, 7 Cir., 1959, 264 F.2d 769; cf. N. L. R. B. v. Superior Co., 6 Cir., 1952, 199 F.2d 39.

7. N. L. R. B. v. Midwestern Instruments, Inc., 10 Cir., 1959, 264 F.2d 829; N. L. R. B. v. Syracuse Color Press, supra; N. L. R. B. v. Swan Fastener Corp., 1 Cir., 1952, 199 F.2d 935.

8. Had the union requested immediate recognition and bargaining there may have been far more reason for the employer to make inquiry. Compare N. L. R. B. v. Armco Drainage and Metal Prod., 6 Cir., 1955, 220 F.2d 573, 582, certiorari denied, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748.

the men all denied membership they were not thereby cowed into avoiding any pro-union stands for the very next day all but one refused to sign an anti-union petition.

 Even though the interrogation was proper, the Board's injunction against any future coercive questioning should be enforced. The coercive and discriminatory conduct after the questioning makes it reasonable to conclude that any future interrogation would have a coercive effect upon the employees. The Board has power to enjoin conduct other than those specific violations proved so long as there is a reasonable relation between the illegal act committed and the forbidden activity. May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 390, 66 S.Ct. 203, 90 L.Ed. 145; cf. United States v. DuPont, 81 S.Ct. 1243

### The Discriminatory Discharges

█ In addition to these cease and desist orders, the Board ordered Firedoor to offer reinstatement to Zeleznik and Campagnola and to repay them for any lost earnings caused by their discharges which it held to be discriminatory. We agree that they were discharged because of their union activity and therefore enforce the Board's order.

Firedoor believed that Zeleznik, its oldest and highest paid technical employee, was a leader in the union movement, though in fact he did not sign a union card until late January. Thus Schecter frequently greeted him with remarks such as "Hello, Shop Steward" or "How's the ringleader?" Zeleznik, moreover, refused President Sussman's request to "talk the fellows out of the union" and Mirsky's request that he sign the anti-union petition. He also asked Sussman if it were not true that company union contracts "were not worth the paper they were written on." Mirsky's comment to him on the evening of March 13. the day of discharge, that "the union

situation * * * had gotten out of hand," suggests that the company fired him because it believed that he was a union supporter and a troublemaker.

The evidence from which the Board inferred that Campagnola was fired because of his union activity, though less compelling than the Zeleznik evidence, is sufficient. Though there was no direct evidence that the company knew of his activity in organizing the union, he did refuse to sign the anti-union petition and Mirsky, when discussing his discharge said "you know the reason why I can't help you." It is significant, moreover, that he was fired by Sussman on the same day as was Zeleznik.

The foregoing evidence made out a prima facie case that the discharges were motivated by anti-union animus. The employer's rebuttal evidence—consisting of a claim that the discharges carried out a policy of retrenchment—does not leave us with the firm conviction that the Board was wrong.

It is true that Firedoor's monthly sales declined from $254,000 in October to $50,000 in December and $58,000 in February,[9] and that neither Campagnola or Zeleznik nor the three men who resigned were replaced. But President Sussman had in early January assured all the technical employees that they need not fear losing their jobs because of slack business conditions and Campagnola had been told by Mirsky in January that his position was secure. It is worth noting that December, the month preceding these assurances, had an even lower sales total than February, the month preceding the discharges. Moreover, it is unlikely that Campagnola and Zeleznik, who were the company's most experienced employees and both of whom had been used to train novices, would have been the only men to be fired for economic reasons. There is no evidence that any of Firedoor's 100 production and maintenance employees were fired. Among the technical employees themselves, Zeleznik and

9. The Board discounted this evidence because Firedoor did not prove that the drop was not seasonal.

Campagnola represented the greatest investment. Though they also were the highest paid, Firedoor's contention that they were fired because that would be the greatest saving is rebutted by Firedoor's offer in February to Garbizu, a trainee who had resigned, to increase his wages if he would return. From all this evidence the Board could properly infer that the men were discharged because of their union activity; its remedial orders are appropriate to remedy the respondent's unfair practices.

Enforcement ordered.