**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MILCO, INC., Tod Manufacturing Company, Inc., and Allan Marine Division of Jervis Corp., Respondents.**

Nos. 108, 109, Dockets 31412, 31418.

United States Court of Appeals Second Circuit.

Argued Oct. 19, 1967.

Decided Jan. 2, 1968.

Corinna Lothar Metcalf, Atty., NLRB; Arnold Ordman, General Counsel; Dominick L. Manoli, Assoc. Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel; Gary Green, Attorney, NLRB, for petitioner.

Harry H. Rains, Bertrand B. Pogrebin, Mineola, N. Y., for respondents.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

■ The National Labor Relations Board, having found that respondents had engaged in unfair labor practices in violation of § 8(a) (1) and § 8(a) (3) of the National Labor Relations Act, 29 U.S. C. §§ 158(a) (1) and 8(a) (3), petitions for enforcement of its order, 159 N.L.R. B. No. 76. The Board found that the respondents had violated Section 8(a) (1) by threatening plant closure or removal if the employees selected a bargaining representative and by coercively interrogating employees about the union; and that they had violated Sections 8(a) (1) and 8(a) (3) of the Act by discharging an employee, one Ronald Thorpe, because of his union activities, and by refusing to reinstate and make whole fifteen employees who struck to protest the discharge of Thorpe. The respondents were ordered to cease and desist from such unlawful threats and interrogation, and to offer full reinstatement to Thorpe and the fifteen strikers. On the Board's petition to enforce that order we must ascertain whether the record "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera

Corp. v. NLRB, 340 U.S. 474, 490, 71 S. Ct. 456, 466, 95 L.Ed. 456 (1951). We hold that, though triers of fact may well have drawn different inferences from the inferences drawn here, there is substantial evidence in the record considered as a whole to support the Board's findings, and accordingly we direct enforcement of its order.

The respondents are affiliated companies with common ownership and management, and a uniform labor policy. They have a common facility in Hicksville, New York, where they are engaged in the manufacture and sale of marine and aircraft parts and related products. In December of 1964 the union, Processing and Fabricating Workers Union, Local 321, National Organization of Trade Unions, initiated an organizing campaign at the plant. The union solicited support among the employees by distributing leaflets and by direct appeals by the organizers who stationed themselves at the driveway to the plant and spoke to the employees when they were entering or leaving the facility. The examiner found that the companies opposed the organizational efforts and attempted to influence the employees against choosing a bargaining agent by devices that included speeches and letters, as well as by a request made of all foremen to ascertain each employee's position on the question of representation and to influence the employees to vote against the union.

During the course of the election campaign there was the inevitable speculation about the likely result, and about the consequences of a union victory. The evidence indicated that the possibility of plant closure, or removal from Hicksville, was a general topic of conversation. One week before the election Foreman Torriere asked employee Doce what Doce's opinion was concerning the union situation. Doce replied to the effect that the election seemed close, and Torriere stated that if the union won "there will be lots of trouble and layoffs and perhaps the company would close out and will move this company. * * * I don't know what the old man might do."

There was also evidence that the General Manager, Rienzo, had asked one employee, Cocheo, how Cocheo felt about the union situation, and Cocheo replied that he thought more people were for the union than the company thought. It was testified, too, that on another occasion Rienzo asked employee Kuke if she "knew how to vote." She said she did, and Rienzo indicated to her his belief that the employees did not need a union. He invited her to come to his office if she did not know how to vote. In mid-March before the holding of the election Foreman Sobeck asked employee Thorpe what Thorpe thought of the union. Thorpe, although an ardent unionist, evaded the question. After the election Sobeck and Thorpe talked again; this time Sobeck expressed surprise at the extent of union support and challenged Thorpe to deny that he had supported the union. On this occasion Thorpe acknowledged that he had voted for the union.

The election was held on April 7, 1965. An initial tally indicated that the union had won, but after there had been hearings on challenges a revised tally, which finally issued on January 12, 1966, showed that the union had not won but had lost. On April 22, 1965, fifteen days after the election, employee Thorpe was absent from work. The testimony was that he had asked another employee, Haist, to report him sick, but Haist had not done so, Haist claiming he was unable to find the nurse who had the responsibility for keeping the attendance records. Later that day Foreman Sobeck asked Haist about Thorpe's absence and Haist told him that Thorpe was home ill. That afternoon Thorpe was called by the Personnel Manager, Reardon, and she told him he was being discharged for failure to call in sick for that day. The asserted ground for the discharge was subsequently changed from that ground, and, when changed, was based upon Thorpe's record of absenteeism and the alleged delivery to and receipt by him of two prior warnings about his absence from work. Thorpe's absentee record was, indeed, a bad one; it amounted to nine days on seven occasions in the few months after his return to the company in December 1964. It was, however, subsequently proved that warning slips were never delivered to Thorpe and that the warning slips allegedly delivered were fabricated after he was discharged.

Thorpe was denied reinstatement by the company. He got a new job where he received more pay than he received from respondents. Some time later, however, on June 6 or 7, he was contacted by the union organizer who told him that a strike was scheduled for June 10 to protest his discharge. On that day eight employees, joined by Thorpe, were on the picket line, and by the end of the strike on July 14 sixteen employees were involved. On July 14 fifteen of the strikers requested and were refused reinstatement. Four were subsequently rehired, but were not reinstated to their former places on the seniority list, and as "new employees" they suffered a loss of employment benefits, including paid holidays, sick leave, and rights to participate in profit-sharing plans, accruing to older employees.

On these facts the Trial Examiner found violations of Sections 8(a) (1) and 8(a) (3) of the Act, and the Board adopted her proposed order, which it now seeks to enforce. We will discuss separately the various practices found unlawful.

### I. Threats of Plant Closure or Removal.

The finding that respondent violated § 8(a) (1) of the Act by threatening to close or move the plant in the event of a union victory in the election is primarily based on the statement made by Foreman Torriere to employee Doce. Although Torriere denied making the statement, the Trial Examiner found Doce to be the more forthright witness and believed his testimony rather than that of Torriere. The issue was thus essentially one of credibility, "an issue for the Trial Examiner and the Board to resolve." E. g., Mak-All Mfg. Inc. v. NLRB, 331 F.2d 404, 405 (2 Cir. 1964). There was evidence of general talk about

a possible closing or removal of the plant, but Torriere's statement, if believed to have been a threat, was unlawful whether it initiated the talk or merely added to the ferment. This case points up that unless employers are prepared to have inferences adverse to them drawn from the activities of their supervisors they must take care to instruct their supervisors not to engage in idle gossip of this sort and not to act so as to feed the flames of such rumors during a representative campaign. It may well be that Torriere had no intention of threatening or intimidating Doce, but the effect of his statement determines the consequences of his act, and the administrative tribunal found that the statement was of the sort that might have inhibiting effects and was therefore an unfair labor practice.

## II. *Interrogation of Employees.*

In evaluating questions arising from the interrogation of employees, the issue is whether the activity is "calculated to frustrate the union's organization campaign by installing fear of reprisals in the employees." NLRB v. L. E. Farrell Company, 360 F.2d 205, 207 (2 Cir. 1966). Where, as here, there is no explicit threat, interrogation is lawful unless the circumstances indicate that coercion is implicit in the questioning. This court has set forth the relevant factors to be examined in determining whether under particular circumstances employer interrogation is inherently coercive. NLRB v. Firedoor Corp., 291 F.2d 328 (2 Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L.Ed.2d 136 (1961); Bourne v. NLRB, 332 F.2d 47 (2 Cir. 1964). These factors include whether there is a background of employer hostility and discrimination; whether the employer seeks information necessary to test a claimed majority or seeks to ferret out information most useful for purposes of discrimination, as when employees are asked to identify union supporters, compare NLRB v. Peerless Products, Inc., 264 F.2d 769, 83 A.L.R.2d 527 (7 Cir. 1959), with NLRB v. Syracuse Color Press, Inc., 209 F.2d 596 (2 Cir. 1954); whether the

identity of the questioner and the place or method of interrogation lent the activity an aura of formality that added to its coercive tendency; and whether the reply was truthful so as to indicate an absence of felt intimidation, or evasive or false so as to indicate an effort by one intimidated to conceal his true allegiance.

From the record in this case, including the questioning by Rienzo, Sobeck and Torriere, it is evident that this activity barely meets the standards set out, but after careful scrutiny we are unable to say that the circumstances do not indicate *any* coercive tendency. While these respondents did not manifest the kind of pervasive hostility or lengthy record of unlawful practices that is sometimes found, it is clear that they opposed the union, and campaigned against it, and there was evidence to support the finding that they had violated the act by threatening plant closure. The information sought from Thorpe, Cocheo, Doce and Kuke was not needed by the employer for any legitimate purpose; it was useful only if the employer wanted to influence the employee's choice in the election. The questions were in each case directed at the individual's own position and sympathies and may not be dismissed as idle inquiries concerning the overall election prospects. The incident involving Kuke appears to the Board to be persuasive evidence that an effort was being made to coerce the employees into rejecting the union. Kuke was told by the General Manager of the plant that the employees would be better off without a union; she was twice asked if she knew "how to vote," and she was invited to go to Rienzo's office for help if she did not know how to vote. However veiled and sophisticated the employer's overtures appear in print, it was possible for the Trial Examiner who saw and heard Reinzo and Kuke to find that this activity amounted to unlawful and coercive activity. Further support for the Trial Examiner's result may be found in the fact that each employee interrogated evaded a direct answer to the asked question. Cocheo sim-

**138**

ply said he thought more people supported the union than the company thought; Kuke said she knew how to vote; Thorpe refused to indicate his allegiance until after the election. The questions were of the type that if the employees had fully answered them the answers would have indicated whether the employee was or was not voting for the union. We therefore find that the Board's finding that this interrogation violated Section 8(a)(1) of the Act is supported by substantial evidence in the record.

### III. *Discharge of Thorpe.*

The issue most sharply contested by the parties is whether the discharge of Ronald Thorpe was an unfair labor practice. Thorpe was an ardent union sympathizer, and his allegiance was admittedly known to the employer prior to the decision to discharge him. He was also the only cadmium plater in the plant and performed an essential task well. He was given a raise about March 15, and there was evidence that he was told by Foreman Sobeck to "keep up the good work."

 It is also not disputed that Thorpe was an absentee problem; he had returned to the company in December 1964 after his discharge from the armed services, and April 22 was the ninth day in which he had been absent from work during that short period. Thus, the Trial Examiner was faced with the problem that so ofter recurs in cases involving claims of discriminatory discharges, the problem of ascertaining why the employee was discharged— here whether Thorpe was discharged for absenteeism, a permissible reason, or for his union sympathies, an impermissible one. It is settled that a discharge motivated even partially by the employee's union activities is unlawful. NLRB v. Jamestown Sterling Corp., 211 F.2d 725, 726 (2 Cir. 1954); and it is equally clear that a discharge for some appropriate reason is not rendered unlawful merely because the employer suffers no sorrow at the departure of a union man. NLRB v. Birmingham Publishing Co., 262 F.2d 2, 9 (5 Cir. 1958);

Local 357, International Brotherhood Board of Teamsters etc. v. NLRB, 365 U.S. 667, 679–680, 81 S.Ct. 835, 6 L.Ed. 2d 11 (1961) (concurring opinion of Mr. Justice Harlan). The question the trier of fact must decide is whether the permissible reason is put forth as a mere pretext to justify an impermissible discharge, or whether the permissible reason is the true reason—in other words, whether an anti-union employee would have been discharged for the same conduct.

 Upon a review of the trier's disposition here that the discharge of this chronic absentee was an impermissible discharge we must first look at the facts and circumstances which the Board interpreted as showing an anti-union motive, and then ask whether these seem to furnish satisfactory support for the Board's conclusion. While evaluating these facts and circumstances the standard we are to apply is that we may upset the finding of the Board only if there is not substantial evidence to support it. Judge Learned Hand put it with characteristic clarity in NLRB v. James Thompson & Co., 208 F.2d 743, 746 (2 Cir. 1953):

> Over and over again we have refused to upset findings of an examiner that the Board has affirmed, not because we felt satisfied that we should have come out the same way, had we seen the witnesses; but because we felt bound to allow for the possible cogency of the evidence that words do not preserve. We do not see any rational escape from accepting a finding unless we can say that the corroboration of this lost evidence could not have been enough to satisfy any doubts raised by the words; and it must be owned that few findings will not survive such a test.

So here, though our own initial evaluation of the facts and circumstances could well have been a different one, we are unable to say that as they appeared to the Examiner they are insufficient to justify her evaluation of them and her subsequent conclusion that the discharge was

in some part motivated by Thorpe's union activities. These facts are present: Thorpe's work, when he worked, was satisfactory; the company's evidence of other discharges for absenteeism was incomplete, and in any event the Board's General Counsel produced evidence that two other employees had equally bad absentee records but had not been discharged; after Thorpe's discharge the company obviously prepared two warning slips which it was claimed had been issued to him at the very times of two earlier absences; after the charges were filed with the Board the company changed the asserted ground of discharge from that of failure to report the April 22 absence to that of excessive absenteeism.

■ Less persuasive but still relevant to our conclusion that the Examiner's finding is supported in the record, is the fact that the discharge was abrupt and timed to follow immediately ,the apparent union victory in the election, and the fact that the discharge was made while the respondents were engaging in acts indicating hostility toward the union. It is essentially the contrived warning slips and the contradiction in the company position on the discharge that impel our conclusion that the finding of the Board should not be disturbed. These factors justify the Examiner's belief that the discharge was motivated by the company's hostility toward Thorpe because of his apparent role in the organizational campaign.

IV. *Failure to Reinstate Strikers.*

After efforts by Thorpe and the union organizer, Musachio, to have Thorpe reinstated were unavailing, the decision to strike was made so as to protest the discharge. Thorpe, as we have stated earlier, had by this time obtained other work, but he agreed to be on the picket line on June 10, the date set for the strike. The walkout lasted more than a month, and eventually involved sixteen employees, fifteen of whom applied to return to work after the strike was ended and were denied reinstatement. On the morning of June 10 the strikers in the picket line carried signs supplied by the union that simply identified them as members of Local 321. During that afternoon, on the advice of the union's attorney, Musachio added the legend "Unfair Labor Practices" and "8A3" to the signs, and explained the meaning of this addition to the strikers. At one point during the prolonged strike, Musachio testified that he told the General Foreman, Paolucci, that "it is very simple to have it over; put Ronald Thorpe back to work." Paolucci denied this, and the Examiner found it unnecessary, in view of all the other credible testimony relative to the purpose of the strike, to resolve this flatly contradictory evidence.

■ On these facts, the Trial Examiner found, and the Board upheld her finding, that the unfair labor practice, Thorpe's discharge, was one of the causes of the strike, that therefore the strike was an unfair labor practice strike, and the strikers were protected against replacement during the period of the strike. Mastro Plastics Corp. v. NLRB, 350 U. S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). As we said in NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2 Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963): "Unfair labor practice strikers must be rehired on demand, NLRB v. Sunrise Lumber & Trim Corp., 241 F.2d 620 (2 Cir. 1957), cert. denied, 355 U.S. 818 [78 S.Ct. 22, 2 L. Ed.2d 34] (1957); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 278 [76 S.Ct. 349, 100 L.Ed. 309] (1956), and are entitled to receive reinstatement and backpay if they are not."

■ It seems that there was ample evidence to support the Board's finding that the strike was called to protest the discharge of Ronald Thorpe. First, the employees were polled two days before the strike whether they would walk out for Thorpe and they answered affirmatively; second, the strike signs indicate the purpose of the protest. The company's contention that the strike was designed to influence the Board and speed up resolu-

tion of the challenge to the election results is supported only by the personal opinion of one employee; and the period of inactivity between Thorpe's discharge and the strike found to have been in protest of that discharge is satisfactorily explained by the union's efforts to secure the reinstatement of Thorpe without a strike.

We therefore conclude that the findings of the Labor Board that the respondents violated Section 8(a) (1) and (3) of the Act by threatening plant closure, by interrogating the employees, by discharging Thorpe, and by failing to reinstate the fifteen strikers who applied for reinstatement are supported by substantial evidence in the record considered as a whole.

Accordingly, we direct that the Board's order be enforced in full.

MOORE, Circuit Judge (dissenting in part):

I am of the opinion that the Board has failed to support its findings of § 8 (a) (1) violations by substantial evidence.

### I. Threats of Plant Closure or Removal

The evidence, unrealistically strained into a threat, is that one week before the election Foreman Torriere stated to employee Doce that "if the union ever gets into the place there will be lots of trouble and layoffs and perhaps the company would close out and will move this company. * * * I don't know what the old man will do." Even if this statement could be considered coercive, a single, isolated statement of personal opinion of a minor supervisor not repeated, authorized or approved by his superiors does not violate the Act. NLRB v. Mt. Clemens Metal Products Co., 287 F.2d 790 (6th Cir. 1961).

The majority opinion states that "this case points up that unless employers are prepared to have inferences adverse to them drawn from the activities of their supervisors they must take care to instruct their supervisors not to engage in idle gossip of this sort and not to act

so as to feed the flames of such rumors during a representative campaign." If the decision does give support to that view, it is in my opinion erroneous. There was no evidence in this case that the employer had started or encouraged plant moving or closure rumors, and the law is clear that an employer has not violated § 8(a) (1) simply because a supervisor is shown to have engaged "in idle gossip of this sort" on one occasion. See NLRB v. Mt. Clemens Metal Products Co., supra; Cone Bros. Contracting Co. v. NLRB, 235 F.2d 37, 41 (5th Cir. 1956).

### II. Interrogation of Employees

The majority opinion states that the conversations related by these employees "barely meets the standards" of coerciveness set out in NLRB v. Firedoor Corp., 291 F.2d 328 (2d Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 242, 7 L. Ed.2d 136 (1961); Bourne v. NLRB, 332 F.2d 47 (2d Cir. 1964). I think it is clear that the conversations described were not coercive and that they do not meet the "fairly severe standards" we set out in *Bourne*: This is demonstrated by the factual similarity of the two cases:

"Examination of the record, interpreted in the light most favorable to the Board, indicated that the interrogation involved here did not in any realistic sense meet the tests set forth.

"(1) There is very little to show any pattern of employer hostility and discrimination.

"(2) The information sought was quite general. 'How is the union doing?'; 'Are the employees for the union?' rather than specifically 'Who are the ring leaders?' 'Who has joined?', etc.

"(3) The principal interrogation was by low ranking supervisors.

"(4) The employees were interrogated informally while at work.

"(5) In general the replies were truthful, i. e., there was no evidence that the interrogation actually inspired fear." 332 F.2d at 48.

The factors to be considered and the tests to be applied as set forth in Bourne were reaffirmed by this court in NLRB v. Lorben Corporation, 345 F.2d 346, 348 (1965) where enforcement was denied because the "record does not contain substantial evidence sufficient to support the Board's conclusion that the interrogation was coercive" (p. 349). The majority states that coercion is shown by the evasive replies of the employees. I see nothing evasive in employee Cocheo answering, when asked how the election would come out, that it looked close to him. In fact that was an accurate observation. I also fail to see the impropriety of the inquiry made of employee Kuke, a recent immigrant, as to whether she knew how to vote. There was certainly nothing evasive in her reply that she did know how.

I find nothing coercive in Foreman Sobeck's conversations with Thorpe which by Thorpe's own admission were short, at his work station, and without threat of reprisal. In any event, the majority has ignored the rule that a few, trivial instances of possibly improper interrogation are not sufficient by themselves to make out a violation under § 8(a) (1). NLRB v. Park Edge Sheridan Meats, Inc., 341 F.2d 725 (2d Cir.1965). In my opinion, the facts relied upon by the Board do not individually or taken together constitute a violation of § 8(a) (1) of the Act. The result reached by the majority serves to place an "in terrorem" clamp upon any utterances normal between employees during periods of organizational or pre-organizational activities. Free speech and the right of both sides to express their views—a supposed constitutional right—are thus abrogated by judicial fiat.

### III. Discharge of Thorpe

Thorpe's discharge may have been because of his excessive absenteeism and his failure to call in sick or because of his Union sympathies, or both. The majority concede that "Thorpe was an absentee problem" and that in the interval between December 1964 and April 22, 1965, he had been absent nine days. It

is scarcely helpful to Company efficiency that his work was satisfactory "when he worked"—particularly, since he was the only cadmium plater in the plant. However, while the evidence is thin, the timing of his discharge, the failure to give him the usual two warnings, and the fabrication of the warning slips is probably sufficient evidence that his discharge was motivated in significant part by his Union status and activities. NLRB v. D'Armigene, 353 F.2d 406, 409 (2d Cir. 1965).

### IV. Failure to Reinstate Strikers

The Trial Examiner found that Thorpe's discharge, an unfair labor practice, was one of the causes of the strike, and that it was therefore an unfair labor practice strike. The evidence was in sharp conflict on this point and the Trial Examiner's findings rest to a great extent on credibility determinations. Review of such determinations is limited (NLRB v. L. E. Farrell Co., 360 F.2d 205, 207 (2d Cir. 1966)), and I think the conclusion reached is supportable.